C. Wayne DICE, Jr., Plaintiff,

v.

CLINICORP, INC., Robert S. Goldsamt, C. Thomas McMillen, McMillen & Company, Inc., and Mid–Atlantic Chiropractic, Inc., Defendants.

Civ. A. No. 95–149.

United States District Court, W.D. Pennsylvania.

May 17, 1995.

James P. Sommers, Monroeville, PA, for plaintiff.

Russell J. Ober, Jr., Pittsburgh, PA, for defendants.

### OPINION AND ORDER

D. BROOKS SMITH, District Judge.

### I. *Introduction*

On February 1, 1995, plaintiff C. Wayne Dice, a chiropractor licensed to practice in Pennsylvania, filed the instant action against CliniCorp, Inc. ("CliniCorp"), Mid–Atlantic Chiropractic, Inc. ("Mid–Atlantic"), and other

defendants, alleging claims for breach of contract, negligence, violations of the federal securities laws, fraud and deceit, and wrongful termination. *See* Docket No. 1. Defendant CliniCorp, a Delaware corporation headquartered in West Palm Beach, Florida, is engaged in the business of managing chiropractic and other health care-related clinics. *See* Docket No. 10, at 2. Defendant Mid–Atlantic, a Pennsylvania professional corporation headquartered in Lebanon, Pennsylvania, conducts a chiropractic practice. *Id.*

Plaintiff's causes of action involve the August 1993 sale of plaintiff's chiropractic business to CliniCorp, as well as plaintiff's resulting employment agreement with Mid–Atlantic. As explained in greater detail below, the relationship among the parties soon deteriorated, and plaintiff eventually filed the instant action.

On March 15, 1995, defendants CliniCorp and Mid–Atlantic filed an Emergency Application for Temporary Restraining Order and Motion for Preliminary Injunction (Docket No. 4). On March 30, 1995, this Court held a hearing on defendants' motion for preliminary injunctive relief.

At that hearing, CliniCorp withdrew its motion for a preliminary injunction, and the hearing proceeded only on behalf of Mid–Atlantic. *See* Docket No. 15 ("Hearing Transcript"), at 3–4. At the conclusion of the hearing, the Court directed the parties to file supplemental memoranda, setting forth proposed findings of fact and legal argument. Counsel was specifically instructed to address the issue of whether Mid–Atlantic had demonstrated the threat of irreparable harm such as to warrant the issuance of a preliminary injunction. *Id.*, at 230–31.

For the reasons explained below, I find that defendant Mid–Atlantic has failed to establish that it will suffer irreparable harm in the absence of preliminary injunctive relief. Accordingly, Mid–Atlantic's request for a preliminary injunction is denied. Because I find that Mid–Atlantic has failed to satisfy one of the essential elements for obtaining an injunction, I need not reach the other elements.

## II. *Findings of Fact*

1. CliniCorp is a Delaware corporation that is engaged in the business of managing chiropractic and other health care-related clinics. Its common stock is traded on the American Stock Exchange. Hearing Transcript, at 6.

2. Mid–Atlantic is a professional corporation that provides chiropractic services in the Commonwealth of Pennsylvania. *Id.*, at 6–7.

3. The sole director, sole corporate officer and majority shareholder for Mid–Atlantic is George L. Jenkins, Jr., a chiropractor located in Lebanon, Pennsylvania. *Id.*, at 138–39.

4. Mid–Atlantic operates under a comprehensive management agreement with CliniCorp. Pursuant to that agreement, Mid–Atlantic is to employ professionals and "technically provide the services to patients" at any CliniCorp clinic in Pennsylvania in exchange for a contractually agreed-upon fee. Hearing Transcript, at 7; Plaintiff's Hearing Exhibit No. 3 ("Management Agreement").

5. The reason for this particular management arrangement between CliniCorp and Mid–Atlantic, according to CliniCorp, is:

> CliniCorp generally, ... as a matter of ... state law, because of a doctrine called the Corporate Practice of Medicine cannot itself, as a Delaware corporation, a non-professional corporation, treat patients. Therefore, it enters into comprehensive management contracts with the professional corporations that provide the services to patients. Those professional corporations [such as Mid–Atlantic] employ the professionals who render services at the clinic site.

Hearing Transcript, at 7.

6. CliniCorp attempts to increase the number of clinic locations where it provides its management services—to "cluster clinics"—because "the more clinics you have, theoretically, the more money you make, as long as the clinic overheads at that location don't exceed the cost to CliniCorp of providing its management services." *Id.*, at 17–19.

7. In its management capacity for Mid–Atlantic and the clinics, CliniCorp has no obligation to consult Mid–Atlantic on a day-

to-day basis. Although Mid–Atlantic is to employ the professionals, CliniCorp, at times, acts in its management capacity in such a way as to implement changes in personnel and salary based upon the assumption that Mid–Atlantic will "ratify" CliniCorp's actions after-the-fact. Mid–Atlantic's Proposed Findings of Fact (Docket No. 17), ¶ 8; Hearing Transcript, at 7–8, 10, 50–51, 143.

8. Pursuant to the terms of the Management Agreement, CliniCorp is to receive at least eighty percent (80%) of the gross collections from any clinic managed by CliniCorp in Pennsylvania, and Mid–Atlantic is to pay the professional staff's salary and benefits from the twenty percent (20%) that Mid–Atlantic retains. Mid–Atlantic's reason for entering into such an arrangement is to "make[ ] money.... To the extent [Mid–Atlantic] has money left after it pays its management fee [80% to CliniCorp] and pays its doctors, whatever is left to [Mid–Atlantic], it makes." Management Agreement, at ¶ 8; Hearing Transcript, at 12–13, 17.

9. Prior to August 25, 1993, plaintiff operated a chiropractic clinic located at 1004 West View Park Drive (the "Original Clinic") through an entity known as Dice Chiropractic, P.C. ("Dice Chiropractic"). Plaintiff provided professional chiropractic services at the Original Clinic. Hearing Transcript, at 13–14, 149–150.

10. On August 25, 1993, plaintiff and Dice Chiropractic entered into an agreement with CliniCorp, pursuant to which CliniCorp acquired the "practice assets" of Dice Chiropractic, which included the physical equipment and accounts receivables of Dice Chiropractic. Plaintiff's Hearing Exhibit No. 8 ("Acquisition Agreement"); Hearing Transcript, at 15, 149–50.

11. In exchange for the Dice Chiropractic assets, CliniCorp agreed to deliver to plaintiff 506,074 shares of unregistered common stock of CliniCorp. CliniCorp was required to cause a Registration Statement to become effective within 120 days of the closing of the Acquisition Agreement for the purpose of registering plaintiff's shares received for the clinic. Acquisition Agreement, ¶ 2.2; Hearing Transcript, at 37–38.

12. Pursuant to the Acquisition Agreement between Dice and CliniCorp and pursuant to the Management Agreement between CliniCorp and Mid–Atlantic, CliniCorp took over virtually every aspect of the operation and management of the Original Clinic. Management Agreement, ¶ 2; Hearing Transcript, at 11–12.

13. Also on August 25, 1995, as required by the Acquisition Agreement, plaintiff entered into an Employment Agreement with Mid–Atlantic. Hearing Transcript, at 14; Acquisition Agreement, ¶ 12.3; Defendant's Hearing Exhibit B ("Employment Agreement").

14. The Employment Agreement specifically provides:

> The parties hereto acknowledge and agree that this Agreement is prepared and will be executed in express conjunction with that certain transaction by which CliniCorp, Inc. has acquired or will acquire substantially all of the assets used by the Employee to provide professional services to patients (the "Transaction"), and that the execution of this Agreement is a material part of, and an inducement to CliniCorp, Inc. ... and Employee to enter into, the Transaction.

Employment Agreement, at 1, Recital C.

15. The Employment Agreement is considered part of "the entire agreement among the parties" to the Acquisition Agreement. Acquisition Agreement, ¶ 14.9.

16. Pursuant to the Employment Agreement and the Acquisition Agreement, plaintiff agreed to devote his full time and efforts to providing professional chiropractic services at the Original Clinic for a period of three years. Employment Agreement. ¶¶ 1.1, 2.1, 3, 6, 7; Acquisition Agreement, ¶ 13.2.

17. Plaintiff agreed that during the term of the Employment Agreement and for a period of two years thereafter, he would not directly or indirectly compete with the business of Mid–Atlantic or own any part of or become the employee of any enterprise that competes with the business of Mid–Atlantic within a ten mile radius of the clinic. Employment Agreement, ¶ 6.1.

18. Plaintiff also agreed that during the term of the Employment Agreement and for a period of two years thereafter, plaintiff would not solicit, encourage or advise patients treated during the term of the Employment Agreement at the Original Clinic to obtain or seek professional services from any professional who is not an employee of Mid–Atlantic, or to solicit, encourage or advise any employees of Mid–Atlantic to terminate their employment with Mid–Atlantic for any reason. Employment Agreement, ¶ 7.

19. Plaintiff expressly agreed in the Employment Agreement that a violation of the provisions of the covenant not to compete or the covenant not to solicit would cause irreparable damage to Mid–Atlantic, and that Mid–Atlantic would be entitled to an injunction. Employment Agreement, ¶¶ 6.1, 7.

20. Plaintiff was to be paid a base salary of $270,000 per year, plus benefits, by Mid–Atlantic pursuant to the Employment Agreement, with the base salary to be adjusted annually based upon the performance of the Original Clinic. Employment Agreement, ¶ 4.1.

21. Unfortunately, soon after the execution of the Acquisition and the Employment Agreements, the relationship among the parties began to deteriorate. Hearing Transcript, at 19–26, 218–221.

22. Plaintiff complained that, in breach of the Acquisition Agreement, CliniCorp failed to cause plaintiff's shares of CliniCorp common stock to be registered for trade within 120 days. Id., at 38, 160. By the time that CliniCorp finally registered a portion of plaintiff's shares, the price per share of CliniCorp's stock had fallen from $2.69 to $0.31. Id., at 150, 160.

23. In February of 1994, plaintiff sent notice to CliniCorp that its failure to cause plaintiff's shares of CliniCorp stock to be registered as required constituted a "material breach" of the Acquisition Agreement. Plaintiff's Hearing Exhibit No. 1.

24. On October 17, 1994, plaintiff informed CliniCorp that, as a result of CliniCorp's failure to properly and timely register plaintiff's shares of CliniCorp stock, plaintiff "hereby declares the [covenants not to com-

pete or solicit] to be null and void." Plaintiff's Hearing Exhibit No. 2.

25. CliniCorp likewise was dissatisfied with plaintiff. CliniCorp was unhappy with plaintiff's hours of providing services at the Original Clinic, plaintiff's alleged failure to charge certain patients for services, and plaintiff's alleged failure to enter information into CliniCorp's billing system to enable services to be billed. Hearing Transcript, at 21–24.

26. For whatever reason, collections at the Original Clinic fell below certain parameters set forth in the Acquisition Agreement, and CliniCorp and Mid–Atlantic determined that they had to "take action to cut the overhead of the clinic." Id., at 26.

27. As a result, CliniCorp (not Mid–Atlantic) decided to implement the "negative bonus" provision in the Employment Agreement, resulting in a reduction in plaintiff's salary. Id., at 26, 46–47, 51.

28. CliniCorp initially adjusted plaintiff's salary downward to $140,000, and on January 30, 1995, reduced it further to minimum wage. Id., at 46, 51, 62–63. CliniCorp stated that it did not need to consult with Mid–Atlantic on this reduction in plaintiff's salary because it was a "payroll reduction that was being implemented consistent with ... [plaintiff's] employment contract he had entered into with Mid–Atlantic, and CliniCorp, as the manager on behalf of Mid–Atlantic, had the payroll function." Id., at 42–43.

29. Also on January 30, 1995, CliniCorp terminated two nonprofessional staff members at the Original Clinic (one of whom is plaintiff's wife), and fired the other chiropractor (Dr. Mort). In reducing overhead in this manner, the "idea was to get to a one doctor, one staff assistant clinic." Hearing Transcript, at 27, 50.

30. On February 1, 1995, plaintiff filed the instant action. Docket No. 1.

31. On March 13, 1995, plaintiff opened a chiropractic clinic known as Chiropractic North at 813B West View Park Drive. Joint Stipulation of Facts (Court Exhibit No. 1 from preliminary injunction hearing), No. 1.

32. Prior to March 13, 1995, plaintiff received permission from the landlord to occupy the premises in which Chiropractic North is located. *Id.*, No. 2.

33. Prior to March 13, 1995, plaintiff informed some patients to the effect that as of March 13, 1995, plaintiff would no longer work at the Original Clinic, and that as of March 13, 1995, he would be at Chiropractic North. *Id.*, No. 3.

34. Prior to March 13, 1995, plaintiff sent or caused to be sent a notice to at least 1,000 patients and to prospective patients announcing the opening of Chiropractic North. *Id.*, No. 4.

35. On March 15, 1995, defendants CliniCorp and Mid–Atlantic filed their motion for a preliminary injunction, seeking to enforce the covenants not to compete or solicit in the Employment Agreement and the Acquisition Agreement. Docket No. 4.

36. As a result of plaintiff's departure from the Original Clinic, CliniCorp has "shut down" the clinic. Hearing Transcript, at 34. CliniCorp plans to reopen the Original Clinic as soon as a new chiropractic associate is hired. *Id.*, at 35–36.

37. At the March 30, 1995 hearing on defendants' motion for preliminary injunction, CliniCorp withdrew its motion, and the hearing proceeded only on behalf of Mid–Atlantic. Hearing Transcript, at 3–4.

38. At the March 30, 1995 hearing, Dr. Jenkins, the sole director, sole corporate officer and majority shareholder of Mid–Atlantic, admitted that he did not direct that a motion for preliminary injunction be filed on behalf of Mid–Atlantic. Hearing Transcript, at p. 141.

39. Dr. Jenkins also admitted that he did not direct that Dr. Mort be fired from the Original Clinic, and he did not direct that plaintiff's wages be reduced to minimum wage. According to Dr. Jenkins, these actions "were all functions of the clinic management, CliniCorp, who was acting as the clinic manager." *Id.*, at 140–41.

40. Dr. Jenkins testified that he does not want CliniCorp to consult him on a day-to-day basis with respect to CliniCorp's management of clinics because he has "enough stuff to do." Dr. Jenkins further testified that he found out about the firing of Dr. Mort and the reduction in plaintiff's salary to minimum wage "after the fact," and that he then ratified those actions by CliniCorp. *Id.*, at 143–46.

41. Mr. Jenkins also acknowledged that other than the clinic at which plaintiff had practiced (the Original Clinic), Mid–Atlantic does not operate at any other clinics in the Pittsburgh area. *Id.*, at 140.

### III. Conclusions of Law

1. Although Mid–Atlantic's request for injunctive relief is based on a state law cause of action (enforcement of restrictive covenants in an employment agreement), this Court must utilize a federal standard in evaluating whether preliminary injunctive relief is appropriate:

> We utilize a federal standard in examining requests to federal courts for preliminary injunctions.... "[A]lthough the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions."

*Instant Air Freight Co., v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir.1989) (quoting *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1141 (3d Cir. 1977)).

2. The grant of injunctive relief "is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Instant Air Freight*, 882 F.2d at 800 (quoting *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)).

3. To obtain a preliminary injunction, the moving party must show:

> "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the status quo." Moreover, while the burden rests upon the moving party to make these two requisite showings, the district

court "should take into account, when they are relevant, (3) the possibility of harm to other disinterested persons from the grant or denial of the injunction, and (4) the public interest."

*Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994) (citations omitted).

4. A preliminary injunction cannot be granted absent a showing of irreparable harm. *Instant Air Freight Co.,* 882 F.2d at 800; *Frank's GMC Truck Center,* 847 F.2d at 102. The moving party must offer a "clear showing of immediate irreparable injury." *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987) (district court's preliminary injunction vacated due to plaintiff's failure to show irreparable harm).

5. In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following trial.'" *Acierno,* 40 F.3d at 653 (quoting *Instant Air Freight Co.,* 882 F.2d at 801).

6. Economic loss "does not constitute irreparable harm." *Acierno,* 40 F.3d at 653.

It seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury:

> The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.,* 40 F.3d at 653 (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974)).

7. "[T]he injury created by a failure to issue the requested injunction must '"be of a peculiar nature, so that compensation in money cannot atone for it."'" *Acierno,* 40 F.3d at 653 (citations omitted). The word "irreparable connotes '"that which cannot be repaired, retrieved, put down again, atoned for."'" *Id.* (citations omitted).

8. In addition, the claimed injury cannot merely be possible, speculative or remote. "Establishing a risk of irreparable harm is not enough." *ECRI,* 809 F.2d at 226.

> [M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," or a "presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury ..."

*Acierno,* 40 F.3d at 655 (citations omitted).

9. In light of this high standard, this Court must conclude that Mid–Atlantic has failed to make a clear showing of irreparable harm in the absence of a preliminary injunction. Given the financial arrangement between CliniCorp, Mid–Atlantic, and plaintiff, the only possible injury to Mid–Atlantic as a result of plaintiff's alleged breach of the covenants not to compete or solicit would be economic injury. The evidence presented at the hearing on Mid–Atlantic's motion for a preliminary injunction conclusively demonstrated that Mid–Atlantic's sole reason for entering into a management relationship with CliniCorp is to make money. *See* Hearing Transcript, at 17 ("To the extent [Mid–Atlantic] has money left after it pays its management fee [80% to CliniCorp] and pays its doctors, whatever is left to [Mid–Atlantic], it makes."). The only possible damage to Mid–Atlantic flowing from plaintiff's alleged breach of the covenants would be the loss of money from the closed clinic.

10. Mid–Atlantic argues that "the very existence of Mid–Atlantic's business in the Pittsburgh area is in serious jeopardy" and that "because Mid–Atlantic and CliniCorp planned to create a cluster of clinics around plaintiff's clinic, which could have resulted in economies of scale and additional contracts with managed care providers, the impact of plaintiff's action resulting in the deprivation of these opportunities becomes totally incalculable." Supplemental Memorandum of Law in Support of Motion for Preliminary Injunction (Docket No. 18), at 6, 7. Mid–Atlantic's argument finds no support in the record.

11. While the evidence presented at the hearing may have demonstrated that *Clini-Corp's* presence in the Pittsburgh chiropractic market may have been jeopardized by plaintiff's recent actions allegedly in violation of the covenants not to compete or solicit (although this Court makes no finding with respect to that issue, given CliniCorp's withdrawal of its motion for preliminary injunctive relief), no evidence was presented that plaintiff's actions affected *Mid–Atlantic* other than in a purely financial way. As noted above, Mid–Atlantic played no part in the management of the Original Clinic and had no "presence" in the Pittsburgh market; Mid–Atlantic merely "ratified" decisions made by CliniCorp with respect to the Original Clinic—even when those decisions concerned the employment and appropriate compensation of the professional staff at the Clinic; Dr. Jenkins (the sole director and sole corporate officer of Mid–Atlantic) testified that he preferred not to be bothered with the day-to-day management of the Clinic because he has "enough stuff to do"; and no one from Mid–Atlantic even directed that the motion for a preliminary injunction be filed in this action on behalf of Mid–Atlantic. Contrary to Mid–Atlantic's argument with respect to the closing of the Original Clinic, the only possible concerns of Mid–Atlantic, and the only possible harm that could result to Mid–Atlantic, relate to the money that it receives pursuant to its Management Agreement with CliniCorp. Such purely economic injury does not constitute irreparable injury.

12. This Court is not bound by the terms of the Employment Agreement in which the parties agreed that a violation of the covenants would constitute irreparable harm and that Mid–Atlantic would be entitled to an injunction. *See* Employment Agreement, ¶¶ 6.1, 7; Mid–Atlantic's Supplemental Memorandum in Support of Motion for Preliminary Injunction (Docket No. 18), at 1–3. A contractual provision simply cannot act as a substitute for a finding by this Court that it would be appropriate to invoke its equitable powers. "[I]t is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate." *Firemen's Ins.*

*Co. of Newark v. Keating,* 753 F.Supp. 1146, 1154 (S.D.N.Y.1990). *See also Baker's Aid v. Hussmann Foodservice Co.,* 830 F.2d 13, 16 (2d Cir.1987) ("the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate"; in affirming denial of preliminary injunction, court noted that there is "no authority in support of the proposition that irreparable harm must inevitably be assumed in breach of covenant cases," and that it is not an automatic process, "but instead depends upon the factual particulars in each case").

13. Although such a contractual provision may constitute evidence in support of a finding of irreparable harm, the mere inclusion of the contractual provision cannot act as a substitute for the requisite showing of irreparable harm. *See Firemen's Ins. Co.,* 753 F.Supp. at 1154 ("The [clause in the contract] ... does not, by its mere presence in the [contract], satisfy the requirement that plaintiff make a showing of likely irreparable harm before the Court will grant its motion for a preliminary injunction."). Absent any other evidence in support of a showing of irreparable harm, the contractual provision in the Employment Agreement at issue here, standing alone, does not provide an adequate basis for a finding of irreparable harm.

An appropriate Order follows.

### *ORDER*

AND NOW, this 17th day of May, 1995, consistent with the foregoing Opinion, Mid–Atlantic's Emergency Application for Temporary Restraining Order and Motion for Preliminary Injunction (Docket No. 4) is hereby DENIED.