# Philadelphia Ear, Nose & Throat Surgical Associates P.C. v. Roth

*Alan Turner,* for plaintiff.
*David R. Dearden,* for defendant.

SHEPPARD JR., *J.,* March 13, 2000—This court denies the petition for a preliminary injunction because plaintiff-petitioner has *failed to prove* that: (1) such a denial will result in immediate and irreparable harm that damages cannot adequately compensate, (2) the balancing of the harms favors granting the preliminary injunction, (3) the injunction requested is reasonably suited to abate the alleged harm, and (4) the plaintiff-petitioner has a clear right to relief.

The court submits the following findings of fact and conclusions of law in support of its contemporaneous order denying the request for injunctive relief.

# FINDINGS OF FACT

(1) On January 20, 2000, plaintiff, Philadelphia Ear, Nose and Throat Surgical Associates P.C., filed a complaint against defendant, Maurice Roth M.D., seeking damages for breach of an employment contract and an order enjoining Dr. Roth from violating the restrictive covenant contained in that contract.

(2) On the same date, PENT filed a petition seeking a temporary restraining order and preliminary injunction.

(3) The court conducted hearings on the petition for preliminary injunction on February 1 and 3, 2000. The court heard oral argument on February 28, 2000.

(4) PENT is a Pennsylvania corporation. (Exhibit P-15.) Lee M. Rowe M.D. is the president and sole shareholder of PENT. (2/1/00, N.T. 14.)

(5) Dr. Rowe is an ear, nose and throat physician (otolaryngologist).

(6) In 1981, Dr. Rowe began work as a physician-employee of Atkins-Keane Otolaryngic Associates Ltd., a medical practice owned and operated by Drs. Atkins and Keane. (2/1/00, N.T. 10.)

(7) When Dr. Rowe joined Atkins-Keane, Atkins-Keane had a limited ENT practice at Northeastern Hospital. (2/1/00, N.T. 39.)

(8) Dr. Rowe eventually became a shareholder of the practice. On April 1, 1988. Atkins-Keane changed its name to "Atkins-Keane-Rowe Otolaryngic Associates Ltd." (Exhibit P-14; 2/1/00, N.T. 10.) On August 5, 1997, upon Dr. Keane's resignation from the practice, Atkins-Keane-Rowe changed its name to "Atkins-Rowe Otolaryngic Associates Ltd." (Exhibit P-14; 2/1/00, N.T. 11-13.)

(9) On February 16, 1999, upon Dr. Atkins' resignation from Atkins-Rowe, Atkins-Rowe changed its name to "Philadelphia Ear, Nose and Throat Surgical Associ-

ates P.C." (Exhibit P-14; 2/1/00, N.T. 13-15.) All three groups—Atkins-Keane-Rowe, Atkins-Rowe and Philadelphia Ear, Nose and Throat Surgical Associates P.C.— are referred to in this document as PENT.[1]

(10) Dr. Rowe's practice is concentrated at Northeastern where he serves as chairman of the department of

---

1. Absent the consent of the employee or an express assignability clause in the employment contract, a restrictive covenant is not assignable. *All-Pak Inc. v. Johnston,* 694 A.2d 347, 351-52 (Pa. Super. 1997). In his answer and at the hearing, Dr. Roth argued that Atkins-Keane-Rowe and PENT are different legal entities, and, if so, the covenant would not be assignable to PENT. Thus, PENT would be unable to enforce the covenant against Dr. Roth. Because the evidence shows that Atkins-Keane-Rowe and Atkins-Rowe and PENT are the same legal entity, the court rejects this argument.

Corporate name changes do not affect the existing rights of persons other than shareholders. 15 Pa.C.S. §1916(b). Dr. Roth was not a shareholder of PENT. Thus, a simple change of the corporate name does not affect PENT's right to enforce the covenant against Dr. Roth. The Business Corporation Law allows a corporation to change its name by amending its certificate of incorporation. 15 Pa.C.S. §1911(a)(1). An amendment changing the corporate name requires approval by the board of directors or by the shareholders. 15 Pa.C.S. §1914(a) and (c)(2)(i). Upon adoption of an amendment changing a corporate name, the corporation shall execute articles of amendment and file them with the Department of State. 15 Pa.C.S. §§1915 and 1916. PENT has produced, under the seal of the secretary of the Commonwealth, copies of the articles of incorporation and articles of amendment showing that the shareholders of the corporation duly adopted the two name changes at issue, and that the corporation filed the articles with the Department of State. (Exhibit P-14.) See also, Pa.R.E. 902(1) (setting forth self-authenticating nature of domestic public documents under seal). The evidence produced by PENT demonstrates that the changes were, indeed, merely name changes and that these changes were duly authorized, executed and filed.

The court concludes that Atkins-Keane-Rowe and PENT are the same legal entity and that the change in corporate name, alone, does not affect PENT's right to enforce the covenant against Dr. Roth.

surgery and chief of otolaryngology.[2] (2/1/00, N.T. 26, 84.) Northeastern is a community hospital in the Port Richmond area of Philadelphia. (2/1/00, N.T. 51-52.)[3] PENT has an office on Allegheny Avenue, across the street from Northeastern, and rents clinic space in Northeastern. (2/1/00, N.T. 51.)

(11) Dr. Rowe admits being one of the busiest ENT physicians in Philadelphia. (2/1/00, N.T. 83.)

(12) On June 30, 1995, defendant, Maurice Roth M.D., entered into an employment agreement with Atkins-Keane-Rowe. (Exhibits P-3, D-5; 2/1/00, N.T. 18-20.)

(13) Dr. Roth is an ENT physician. (2/3/00, N.T. 9-10.)

(14) The agreement provided that:

(a) Dr. Roth would receive an annual salary of $150,000, but that the salary was subject to revision by the board of directors of Atkins-Keane-Rowe (exhibit P-3, ¶4);

(b) Atkins-Keane-Rowe would pay the cost of Dr. Roth's professional liability insurance during the term of the agreement (exhibit P-3, ¶5); and

(c) The agreement was effective from July 5, 1995 until June 30, 1996, and was to continue from year to year unless terminated by either party upon 90 days written notice. (Exhibit P-3, ¶3.)

---

2. Dr. Rowe's former fellow-shareholders concentrated their practices at other hospitals. Dr. Atkins based his practice at Pennsylvania Hospital. (2/1/00, N.T. 11.) Dr. Keane based his practice at Thomas Jefferson University Hospital and Pennsylvania Hospital. (2/1/00, N.T. 11-12.)

3. After an alignment with or acquisition by Temple University, Northeastern has apparently changed its name to "Temple East" or "Northeastern, a Division of Temple East." (2/1/00, N.T. 64-65.) For the purposes of this document, the court treats "Northeastern," "Temple East" and "Northeastern, a Division of Temple East" as interchangeable words.

(15) The agreement contained the following restrictive covenant:

"(10) *Restrictive covenant*

"(a) . . . Upon termination of employee's employment hereunder, employee agrees to resign his staff privileges at Pennsylvania Hospital, Northeastern Hospital, Wills Eye Hospital and Thomas Jefferson University Hospital and will not practice at such hospitals for a period of two years after his termination of employment hereunder.

"(b) Employee acknowledges that the restrictions contained in the foregoing subparagraph (a) in view of the nature of the practice in which corporation is engaged, are reasonable and necessary in order to protect the legitimate business interest of corporation, and that any violation thereof would result in irreparable injuries to corporation, and employee therefore acknowledges that, in the event of his violation of any of these restrictions, corporation shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such violation, which rights shall be cumulative and in addition to any other rights or remedies to which corporation may be entitled.

"(c) If the period of time or the area specified in subparagraph (a) above should be adjudged unreasonable in any proceeding, then the period of time shall be reduced by such number of months or the area shall be reduced by the elimination of such portion thereof or both so that such restrictions may be enforced in such area or for such time as is adjudged to be reasonable. If employee violates any of the restrictions contained in the foregoing subparagraph (a), the restrictive period shall not run in favor of employee from the time of the commencement of any such violation until such time as such violation

shall be cured by employee to the satisfaction of corporation." (Exhibit P-3.)

(16) The agreement further provided that, "[u]pon termination of employee's employment hereunder for any reason whatsoever, employee agrees not to initiate contact or to solicit any patients of corporation and agrees that all [patient] lists, records and information shall remain the sole and confidential property of corporation." (Exhibit P-3, ¶12.)

(17) On November 20, 1995, the board of directors of Atkins-Keane-Rowe unanimously resolved to change Dr. Roth's compensation to $80,000 annually plus 50 percent of the actual amount collected by Atkins-Keane-Rowe exceeding $160,000 per contract year for professional services personally performed by Dr. Roth. (Exhibit P-4; 2/1/00, N.T. 19-21; 2/3/00, N.T. 11.) That change was effective February 1, 1996. (Exhibit P-4.) In a letter dated November 20, 1995, Dr. Rowe informed Dr. Roth of this salary change. (Exhibit P-4; 2/1/00, N.T. 21.)

(18) Dr. Roth admitted that he discussed the salary change with Dr. Rowe and acquiesced in the change. (2/3/00, N.T. 11-12, 49.)

(19) For the period February 1, 1996 through January 31, 1997, PENT deducted certain practice-related expenses from Dr. Roth's pay. (Exhibits D-2, D-3, D-4; 2/1/00, N.T. 97-100; 2/3/00, N.T. 10-16, 19-22, 36-43.) Those expenses included unemployment compensation taxes and workers' compensation taxes. (Exhibits D-2, D-3, D-4; 2/1/00, N.T. 97-100; 2/3/00, N.T. 10-16, 19-22, 36-43.) The deductions totaled $10,784. (Exhibit D-2; 2/3/00, N.T. 16.) Dr. Roth thought that the deductions were not in accordance with the agreement, and contacted the PENT accountant concerning those deductions. (2/3/00, N.T. 13-14, 93-94.) Dr. Roth testified that the ac-

countant told him that she could do nothing about the deductions. (2/3/00, N.T. 14.)

(20) For the period February 1, 1997 through January 31, 1998, PENT again deducted from Dr. Roth's salary the practice-related expenses and, for the first time, the cost of Dr. Roth's malpractice insurance premium. (Exhibits D-3, D-4; 2/1/00, N.T. 99, 100; 2/3/00 N.T. 20.) These deductions totaled $34,217, including $21,685 for the malpractice insurance premium. (Exhibit D-3; 2/3/00, N.T. 38.) PENT had not deducted the cost of Dr. Roth's malpractice insurance premium from his salary before February 1, 1997. (Exhibit D-2; 2/1/00, N.T. 97; 2/3/00, N.T. 13.)

(21) Dr. Roth testified that he again contacted the PENT accountant regarding the deductions but that she again told him that she could do nothing about them. (2/3/00, N.T. 20, 93-94.)

(22) For the period February 1, 1998 through January 31, 1999, PENT again deducted from Dr. Roth's salary the practice-related expenses and the cost of the malpractice insurance premium. (Exhibits D-3, D-4; 2/1/00, N.T. 99, 100.) The deductions totaled $43,535, including $26,426 for the malpractice insurance premium. (Exhibit D-4; 2/3/00, N.T. 38.)

(23) The agreement and the amendment to that agreement do not expressly allow or disallow deductions for unemployment compensation taxes, workers' compensation taxes or other practice-related expenses. (Exhibits P-3, P-4; 2/1/00, N.T. 97.) Dr. Rowe testified that he does not know whether the deductions of unemployment compensation taxes and workers' compensation taxes were in accordance with the agreement. (2/1/00, N.T. 98.) Dr. Rowe admitted that the deductions of malpractice insurance premiums from Dr. Roth's pay were not in accordance with the agreement. (2/1/00, N.T. 96.)

(24) In summer 1998, Dr. Roth gave Dr. Rowe a proposed written employment contract for Dr. Rowe to consider. (2/1/00, N.T. 89.) Dr. Rowe gave this proposed contract to his attorney. (2/1/00, N.T. 89-90, 91.) Although Dr. Roth attempted to arrange meetings with Dr. Rowe to discuss the draft contract, Dr. Rowe never did discuss the proposed contract with Dr. Roth. (2/1/00, N.T. 89-91; 2/3/00, N.T. 89).

(25) There is some evidence that Dr. Rowe thought that the breakup of the group and the departures of Drs. Atkins and Keane had altered the employment arrangement between PENT and Dr. Roth. James F. McDonald Jr. M.D. testified that Dr. Rowe told him over a year ago that Dr. Rowe's practice was in a state of flux because of the departures, and that Dr. Roth's arrangement with PENT was undefined. (2/1/00, N.T. 179-82.)

(26) In summer 1999, Dr. Roth prepared to leave PENT and start his own practice. The preparations included setting up his own S-corporation, hiring a billing service and searching for office space. (2/1/00, N.T. 134; 2/3/00, N.T. 42.)

(27) In summer 1999, Dr. Roth engaged Little Data Centers to help him with medical billing. (2/1/00, N.T. 134.) Dr. Roth gave Little Data his provider numbers and a post office box address to which his mail was to be sent. (2/1/00, N.T. 135-38.) On December 10, 1999, Little Data notified individual providers of Dr. Roth's provider numbers and change of address. (Exhibit P-8; 2/1/00, N.T. 135-37.)

(28) In December 1999, US Healthcare sent a reimbursement check directly to Dr. Roth's post office box. (Exhibit P-9, p. 2; 2/1/00, N.T. 137-38.) The reimbursement was for services that Dr. Roth had rendered while an employee of PENT. (Exhibit P-9, p. 2.) There is no evidence that Dr. Roth or Little Data intentionally diverted to Dr. Roth funds due and owning to PENT. (2/1/00, N.T. 137-38; 2/3/00, N.T. 51.) There is no evidence that Dr. Roth cashed any

check for funds rightfully owed to PENT. (2/3/00, N.T. 51.) This incident has not been shown to be anything other than a mistake.

(29) On or about December 13, 1999, Dr. Rowe and Dr. Roth met in the cafeteria at Northeastern. (2/1/00, N.T. 23.) Dr. Roth told Dr. Rowe that he was resigning from PENT, and that Dr. Rowe would receive a letter confirming his resignation. (2/1/00, N.T. 23.) At that meeting, Dr. Roth gave no specific date of his leaving, but said only that he could provide coverage in some manner. (2/1/00, N.T. 23.)

(30) Sometime after that meeting, Dr. Rowe received Dr. Roth's resignation letter by certified mail. (Exhibit P-6.) The resignation letter was dated November 24, 1999 but postmarked December 13, 1999. (Exhibits P-6, P-7.) The resignation letter gave January 17, 2000, as Dr. Roth's last day, and proposed a transition period after that date, during which Dr. Roth would "provide reasonable coverage." (Exhibit P-6.)

(31) On December 21, 1999, Dr. Rowe confronted Dr. Roth about the PENT reimbursement check that was forwarded to Dr. Roth's post office box. (2/1/00, N.T. 32-33.)

(32) In a hand-delivered letter dated January 7, 2000, Dr. Rowe gave Dr. Roth notice of his immediate termination. (Exhibit P-9; 2/1/00, N.T. 38.)

(33) Before his termination, Dr. Roth submitted to Little Data certain medical bills for services that Dr. Roth rendered while employed by PENT. (2/1/00, N.T. 146; 2/3/00, N.T. 52.) The total amount collectible under those bills was approximately $3,300. (2/1/00, N.T. 151-52.) Dr. Roth testified that he had first submitted these bills to Rose Ellen Tomczak, PENT's office manager, and that Ms. Tomczak had informed him that the bills were not collectable. (2/3/00, N.T. 52.) He then submitted the bills to Little Data for analysis. (2/3/00, N.T. 52.) The bills were never submitted for collection. (2/1/00, N.T. 158-59.) After learning that PENT reimbursements were sent to his post office

box, Dr. Roth instructed Little Data to stop working on the bills. (2/1/00, N.T. 158-59; 2/3/00, N.T. 54-55.)

(34) Before leaving PENT, Dr. Roth had leased two office spaces. One is in northeast Philadelphia at 9150 Marshall Street. (2/3/00, N.T. 59-61.) The second is at 3370 Memphis Street near Northeastern. (2/3/00, N.T. 61.)

(35) On January 10 or 11, 2000, Dr. Roth faxed a type-written notice of his new addresses and phone numbers to area physicians who might have referrals or consultations for him. (2/3/00, N.T. 76.)

(36) There are five ENT physicians on staff at North-eastern: Dr. Rowe, Dr. Roth, Dr. Banks, Dr. Granoff and Dr. Rosen. (2/1/00, N.T. 79-80.) However, only Dr. Rowe and Dr. Roth practice regularly at Northeastern. (2/1/00, N.T. 116.) Dr. Granoff, Dr. Banks and Dr. Rosen have full-time practices at other hospitals and provide almost no services to Northeastern patients. (2/1/00, N.T. 80, 167, 172.)

(37) Dr. Rowe testified that, by continuing to practice at Northeastern, Dr. Roth has caused a schism in the staff at Northeastern. (2/1/00, N.T. 59-60.)

(38) In his 19 years practicing ENT medicine at North-eastern, Dr. Rowe has developed referral relationships with other physicians. (2/3/00, N.T. 82.)

(39) Some of these referrals come from the Northeast-ern emergency room. The emergency room uses ENT physicians on an on-call basis for emergencies, and on a consulting basis for non-emergencies. (2/1/00, N.T. 163.) As chairman of the department of surgery, Dr. Rowe pro-vides the emergency department with the call schedule. (2/1/00, N.T. 166.) The ENT physician on call at North-eastern has historically been, and continues to be, Dr. Rowe. (2/1/00, N.T. 164-66.) When Dr. Roth was a PENT employee, he and Dr. Rowe shared the emergency room call equally through Dr. Rowe's call service. (2/1/00, N.T. 165.) Since Dr. Roth's departure from PENT, Dr. Rowe is the only ENT physician on call at Northeastern's emer-gency room. (2/1/00, N.T. 166.)

(40) PENT also receives consultations from family practitioners, internists, cardiologists, specialists and pediatricians. (2/1/00, N.T. 40-41.) Historically, PENT has received consultations primarily from Dr. Nesbitt's group, and Dr. Steinbach, Dr. Vile and Dr. Solon. (2/1/00, N.T. 41-50.)

(41) Dr. Rowe testified that in the past PENT received 60-70 referrals per month from Dr. Nesbitt's group (2/1/00, N.T. 41-42, 48, 49-50), and eight referrals per month each from Dr. Steinbach, Dr. Vile and Dr. Solon. (2/1/00, N.T. 48.)

(42) Dr. Rowe testified that from January 7, 2000 through February 1, 2000, PENT received no referrals from Dr. Nesbitt's group, or Dr. Steinbach, Dr. Vile or Dr. Solon. (2/1/00, N.T. 41-42, 47-48, 49-50.) Dr. Rowe continues to receive consultations from other physicians. (2/1/00, N.T. 114-15.)

(43) On the other hand, Dr. Rowe testified that in that same period (January 7 through February 1, 2000), neither the number of surgeries that he has performed nor the number of his patient visits has decreased. (2/1/00, N.T. 106.)

(44) Dr. James F. McDonald Jr. M.D. is an employee and shareholder of Dr. Nesbitt's group and a member of the executive committee of Northeastern. (2/1/00, N.T. 177, 184.) Dr. McDonald testified that there had been no conscious decision by Dr. Nesbitt's group to not refer patients to Dr. Rowe. (2/1/00, N.T. 177.) Dr. McDonald testified that the Nesbitt group would like to continue to refer patients to both Dr. Roth and Dr. Rowe. (2/1/00, N.T. 177-78.)

(45) Dr. Roth testified that from January 7, 2000 through February 3, 2000, Dr. Nesbitt's group sent him three or four patients, and Drs. Vile, Solon and Goldstein sent him two or three patients. (2/3/00, N.T. 83-84.) Dr. Roth admitted that, under ordinary circumstances, these patients would have gone to PENT. (2/3/00, N.T. 84.) Dr. Rowe

testified that he knew of one referral by Dr. Steinbach to Dr. Roth. (2/1/00, N.T. 44-47.)

(46) On January 10, 2000, Dr. Roth performed three surgeries at Northeastern. (2/3/00, N.T. 84-86.) Dr. Roth had scheduled these three surgeries before PENT terminated him. (2/3/00, N.T. 84.) By the terms of the January 7, 2000 termination letter, PENT permitted Dr. Roth to perform these previously scheduled surgeries. (Exhibit P-5; 2/3/00, N.T. 86.)

(47) After January 10, 2000, Dr. Roth performed three surgeries at Northeastern Hospital. (2/3/00, N.T. 85.)

(48) The number of patients at Northeastern has increased since 1995—the date of the original agreement—as a result of the "downsizing" at nearby hospitals. (2/1/00, N.T. 77-78, 169.) In winter 1999, the average daily census was about 80 patients. (2/1/00, N.T. 169.) Today, the daily census is between 110 and 150 patients. (2/1/00, N.T. 169-70.)

(49) There is no shortage of ENT patients at Northeastern. (2/1/00, N.T. 169.) Dennis M. Guest D.O., chairman of the emergency medicine department and the chairman of the utilization committee at Northeastern, testified that there is enough work at Northeastern to keep two or more ENT physicians busy. (2/1/00, N.T. 168-69.) Northeastern seems to *need* at least two ENT physicians. Dr. Guest said that if only one ENT physician were serving the hospital and were that ENT physician to be in surgery, on vacation or otherwise unavailable, he would be concerned. (2/1/00, N.T. 168.)

(50) Dr. Rowe testified that hiring another physician-employee will be difficult. (2/1/00, N.T. 36.) Residents nationwide traditionally end their residency training on June 30 and begin private practice on July 1. (2/1/00, N.T. 35.) Dr. Rowe testified that the vast majority of residents who will become available on July 1, 2000 have already committed to fellowships or practices elsewhere. (2/1/00, N.T. 36.) As of February 1, 2000, Dr. Rowe had not placed a printed advertisement for a new physician. (2/1/00, N.T.

109-110.) He had, however, called the chiefs of the residency programs at Temple and Jefferson to ask about residents who will become available, but found none. (2/1/00, N.T. 107-109.)

(51) Dr. Rowe testified that he will not use Dr. Banks or Dr. Granoff for backup. (2/1/00, N.T. 120.) Should the need for a backup arise, Dr. Rowe intends to use Dr. Rosen or Dr. Keane. (2/1/00, N.T. 61.) Although Dr. Rosen is on staff at Northeastern, Dr. Rosen's full-time responsibilities at Jefferson Hospital limit his ability to cover Dr. Rowe. (2/1/00, N.T. 80.) Dr. Keane is not currently on staff at Northeastern. (2/1/00, N.T. 61.)

(52) Dr. Roth claims that PENT owes him $73,000 arising from the salary deductions he claims were improper. (2/3/00, N.T. 77-79.) As of February 3, 1999, PENT had not reimbursed Dr. Roth for either the malpractice insurance premiums or other deductions. (2/3/00, N.T. 79.)

(53) Both Dr. Rowe and Dr. Roth hold staff privileges at other Philadelphia hospitals. (2/1/00, N.T. 75; 2/3/00, N.T. 62.) Both physicians practice full-time at Northeastern, and use other hospitals primarily when a patient requires treatment that is not available at Northeastern. (2/1/00, N.T. 75; 2/3/00, N.T. 62, 63.)

(54) Should Dr. Roth be ordered not to practice at Northeastern for two years without having to resign his staff privileges, the hospital would likely permit him to retain those privileges. (2/1/00, N.T. 173-74.)

## DISCUSSION

PENT asks this court to order Dr. Roth to resign his staff privileges at Northeastern and to not practice at Northeastern for two years.[4] In support of its position, PENT relies on the agreement between the parties containing the restrictive covenant.

---

4. PENT does not seek to enforce the portion of the restrictive covenant which would bar Dr. Roth from practicing at Pennsylvania Hospital, Wills Eye Hospital or Jefferson Hospital.

First, PENT has not convinced the court that the agreement is enforceable by PENT. Second, even if the agreement were enforceable, PENT has not shown that any alleged unlawful conduct by Dr. Roth will cause PENT immediate and irreparable harm that monetary damages cannot compensate.

In determining whether to grant a preliminary injunction, a court may consider the averments of the pleadings and petition, affidavits of the parties or third parties, or any other proof. Pa.R.C.P. 1531. A preliminary injunction is "a most extraordinary form of relief which is to be granted only in the most compelling cases." *Goodies Olde Fashion Fudge Co. v. Kuiros,* 408 Pa. Super. 495, 501, 597 A.2d 141, 144 (1991). "The purpose of a preliminary injunction is to preserve the status quo as it exists *or previously existed before the acts complained of,* thereby preventing irreparable injury or gross injustice." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 259, 602 A.2d 1277, 1286 (1992). (emphasis in original) A preliminary injunction should issue only where there is urgent necessity to avoid injury for which damages cannot compensate. *Id.*

The court may grant the injunction only if the moving party has sufficiently established the following five elements:

"(1) that relief is necessary to prevent immediate and irreparable harm [that damages cannot compensate]; (2) that greater injury will occur from refusing the injunction than [by] granting it; (3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct; (4) that the alleged wrong is manifest, and the injunction is reasonably suited to abate it; and (5) that the plaintiff's right to relief is clear." *Cappiello v. Duca,* 449 Pa. Super. 100, 105, 672 A.2d 1373, 1376 (1996); see also, *School District of Wilkinsburg v. Wilkinsburg Education Association,* 542 Pa. 335, 338 n.2, 667 A.2d 5, 6 n.2 (1995) and *New Castle Orthopedic As-*

*sociates v. Burns,* 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978).

"Additionally, the concern of the courts for the public welfare results in a close judicial scrutiny of restraints on physicians because of the value of their services to the community . . . ." *New Castle Orthopedic Associates,* 481 Pa. at 464, 392 A.2d at 1385; *West Penn Specialty MSO Inc. v. Nolan,* 737 A.2d 295 (Pa. Super. 1999). These requisite elements "are cumulative, and if one element is lacking, relief may not be granted." *Norristown Municipal Waste Authority v. West Norriton Township Municipal Authority,* 705 A.2d 509, 512 (Pa. Commw. 1998).

PENT has failed to sufficiently establish the requisite elements for injunctive relief. First, PENT has failed to establish immediate and irreparable harm that damages cannot compensate. A Pennsylvania court sitting in equity may enjoin a breach of a contract—including a breach of a restrictive covenant contained in an employment agreement—where money damages are an inadequate remedy. *John G. Bryant Co. Inc. v. Sling Testing & Repair Inc.,* 471 Pa. 1, 369 A.2d 1164 (1977). Here, the covenant requires Dr. Roth resign his Northeastern staff privileges upon termination from PENT and refrain from practicing at Northeastern for two years. (Exhibit P-3.) Dr. Roth has not resigned those staff privileges. He continues to practice at Northeastern. If the covenant is enforceable, Dr. Roth is in breach. But Dr. Roth's breach of covenant (if assumed), alone, does not entitle PENT to preliminary injunctive relief. *New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 466-67, 392 A.2d 1383, 1386 (1978); *Herman v. Dixon,* 393 Pa. 33, 141 A.2d 576 (1958); *Rollins Protective Services Co. v. Shaffer,* 383 Pa. Super. 598, 601, 557 A.2d 413, 415 (1989).

PENT must show irreparable harm. PENT could do so by showing that Dr. Roth has stolen patients, taken patient lists or other confidential information, or that PENT has lost patients or income or has otherwise suffered damage as a result of the alleged violation of the covenant.

*New Castle Orthopedic Associates,* 481 Pa. at 466, 392 A.2d at 1386 (reversing issuance of preliminary injunction enforcing a restrictive covenant contained in the physician's employment agreement where the plaintiff failed to show that defendant had stolen patients, taken patient lists or that defendant had lost patients or income); *Herman,* 393 Pa. at 37, 141 A.2d at 578 (reversing issuance of preliminary injunction enforcing a restrictive covenant contained in physician's employment contract where trial court refused to permit defendant to cross-examine plaintiff as to whether the plaintiff's income had decreased, whether plaintiff's practice had been damaged, or whether the defendant had used plaintiff's confidential information or solicited plaintiff's patients); *West Penn Specialty MSO Inc. v. Nolan,* 737 A.2d 295 (affirming issuance of preliminary injunction enforcing restrictive covenant contained in contract for the sale of defendant's medical practice to plaintiff, where defendant set up a competing practice treating 125 of her prior patients).

Paragraph 10(b) of the agreement—in which the parties agreed that a violation of the restrictive covenant would constitute irreparable harm and entitle PENT to an injunction—is not binding on the court. The parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where an injunction would otherwise be inappropriate. See *Dice v. Clinicorp Inc.,* 887 F. Supp. 803 (W.D. Pa. 1995).

The record fails to demonstrate that PENT will suffer irreparable injury as a result of Dr. Roth's practicing at Northeastern. There is no evidence that Dr. Roth took PENT patient lists or stole PENT's former patients in violation of the anti-solicitation covenant. (Exhibit P-3, ¶12.) There is no evidence that Dr. Roth's practicing at Northeastern has caused PENT financial injury or has damaged the good will that Dr. Rowe has established during his many years at Northeastern. Dr. Roth and Dr. Rowe are the only ENT physicians practicing full-time at Northeastern. (2/1/00, N.T. 116.) Dr. Guest testified that there is

"plenty of work" at Northeastern for two or more ENT physicians. (2/1/00, N.T. 168-69.) Dr. Rowe testified that he is one of the busiest ENT physicians in the city. (2/1/00, N.T. 83.) With Dr. Roth's departure from PENT, Dr. Rowe is shorthanded.[5] Dr. McDonald—a principal in PENT's largest source of physician referrals—expressed a desire to refer patients to both Dr. Roth and Dr. Rowe. (2/1/00, N.T. 177-78.) Dr. Rowe has a full workload. He is doubtful that he can hire another physician-employee in the near future to help share that workload. Confronted with a similar situation in *New Castle Orthopedic Associates,* our Supreme Court stated:

"This is quite unlike the normal commercial situation in which there are only a limited number of prospective clients and the alleged breach significantly affects the share of the former employer. Here, the potential pool of clients far exceeds the appellee's ability to serve them. Under these circumstances it is difficult to find any irreparable injury wrought upon the appellee by the appellant." *New Castle Orthopedic Associates,* 481 Pa. at 468, 392 A.2d at 1387 (dissolving preliminary injunction).

As in *New Castle Orthopedic Associates,* there are more potential ENT patients at Northeastern than Dr. Rowe is

---

5. Counsel for PENT urged that, because Dr. Roth's actions have left Dr. Rowe shorthanded, equity should preclude Dr. Roth from asserting Dr. Rowe's shorthandedness as a reason for denying the injunction. Counsel's argument ignores the fact that, even if the 90-day notice provision is enforceable and even had Dr. Roth given 90 days notice, PENT still would be left with a single physician and, by Dr. Rowe's own admission, little hope of hiring another for some time. (2/1/00, N.T. 36.)

A contrary view is suggested by the decision in *Robert Clifton Associates Inc. v. O'Connor,* 338 Pa. Super. 246, 487 A.2d 947 (1985). In reversing the trial court's limitation of a covenant to four months, our Superior Court held that a one-year restriction period was reasonable based on the time it would take plaintiff, employment agency, to put a new man on the job and for that new employee to have a reasonable opportunity to demonstrate his effectiveness to his customers. *Id.,* 338 Pa. Super. at 255-56, 487 A.2d at 952.

able to serve. *Id.* No immediate harm results from Dr. Roth's treating patients that Dr. Rowe could not treat in any event. *Id.* Under these circumstances, the court cannot find that Dr. Roth's presence at Northeastern will irreparably harm PENT.[6,7] *Id.; Herman,* 393 Pa. at 37, 141 A.2d at 578.

Second, PENT has not established that greater injury would result by refusing the injunction than by granting it. Allowing Dr. Roth to continue practicing at Northeastern will cause no immediate and irreparable injury to PENT. However, to prohibit Dr. Roth from practicing at Northeastern will cause Dr. Roth to lose his primary source of income and would decrease access to ENT treatment in the community that Northeastern serves. Dr. Rowe testified that the "real issue" behind barring Dr. Roth from Northeastern is to get "rid of a schism in the institution which will not serve it well." (2/1/00, N.T. 72.) Yet, Dr. Guest's testimony was the opposite: that the hospital will not be harmed, and can only benefit, by the presence of Dr. Roth. (2/1/00, N.T. 49.) The balancing of the harms favors denying the injunction. *New Castle Orthopedic Associates,* 481 Pa. at 469, 392 A.2d at 1388 (dissolving preliminary injunction where the plaintiff had shown no irreparable harm caused by its former employee's continuing to practice medicine in the restricted area, and where the harm flowing from granting the preliminary injunction would have decreased public access to medical treatment in the area).

---

6. The court does not now decide if PENT is entitled to damages for lost profits for those patients that Dr. Roth would have treated on PENT's behalf during the 90 days following his notice of resignation. Since those damages would be temporary and calculable, they do not constitute irreparable harm.

7. Although it may be beyond the parameters of the proceedings at this stage, this court strongly suggests that Dr. Roth not solicit any of Dr. Rowe's current patients.

Third, an injunction barring Dr. Roth from practicing at Northeastern is not reasonably suited to abate that harm against which the original covenant was meant to protect. In 1995, when Dr. Roth signed the agreement, the number of patients coming through Northeastern was substantially less than it is today. Given the smaller patient population and the availability, if necessary, of Dr. Atkins and Dr. Keane when Dr. Roth began his employment, perhaps an injunction would have been reasonably suited to protect PENT's practice at that time. But today, the patient population has grown to where Dr. Roth's presence at Northeastern can do little immediate and irreparable harm to PENT. Hence, the requested injunction is not reasonably suited to abate the alleged wrong.

Fourth, PENT has failed to establish a clear right to relief. Over the course of Dr. Roth's employment with PENT, PENT deducted from Dr. Roth's pay certain disputed expenses, including malpractice insurance premiums, unemployment compensation taxes and workers' compensation taxes. (Exhibits D-2, D-3 and D-4.) The deductions exceed $75,000. Although Dr. Roth complained to the PENT accountant about these deductions, the deductions continued. (2/3/00, N.T. 13-14, 93-94.) At the hearing, Dr. Rowe admitted that the deductions of malpractice insurance premiums—which, alone, exceeded $48,000—were not in accordance with the agreement. (2/1/00, N.T. 96.) Dr. Rowe admitted that he was unsure whether the remaining deductions were proper under the agreement. (2/1/00, N.T. 98.)

Under Pennsylvania law, when a party materially breaches a contract, the non-breaching party is not required to fulfill its duties under the contract. *Ott v. Buehler Lumber Co.,* 373 Pa. Super. 515, 518, 541 A.2d 1143, 1145 (1988); *Oak Ridge Construction Co. v. Tolley,* 351 Pa. Super. 32, 41, 504 A.2d 1343, 1348 (1985); Restatement (Second) of Contracts §369. This court does not now decide whether deductions were improper and, if improper, whether taking them, resulting in a decrease in Dr. Roth's

net pay, constituted a material breach of the agreement. See *Forest City Grant Liberty Associates v. Genro II Inc.,* 438 Pa. Super. 553, 559, 652 A.2d 948, 951 (1995) (stating that the materiality of a breach is a question of fact). The court concludes, however, that on this record it may be argued that PENT materially breached the agreement.[8] Consequently, PENT has not shown that its right to enforce that agreement against Dr. Roth is clear.[9]

8. Dr. Roth also argues that PENT breached the employment agreement by forcing Dr. Roth to see a disproportionate share of Medicaid and uninsured patients. (Answer ¶¶89-95.) Tomczak testified that Medicaid reimburses at a somewhat lower rate than private insurance. (2/3/00, N.T. 98, 166.) Because Dr. Roth's salary was linked in part to his collections, Dr. Roth argues that it was unfair under his employment contract to force him to see a disproportionate share of Medicaid and indigent patients. Dr. Roth produced some evidence that he had seen a disproportionate number of Medicaid patients in October 1999: in eight selected days in October 1999, Dr. Roth saw 60 Medicaid patients, while Dr. Rowe saw only three. (Exhibit D-6; 2/3/00, N.T. 55-58.) But additional evidence shows that in 1997, 1998 and 1999, Dr. Roth and Dr. Rowe's collection percentages were about equal. (Exhibit P- 16; 2/1/00, N.T. 52-59; 2/3/00, N.T. 154-55.) The court cannot find on the record that PENT's allocation of Medicaid and indigent patients was in violation of any contract that existed between PENT and Dr. Roth. Furthermore, the court is not convinced that PENT's allocation of a larger percentage of Medicaid and indigent patients to Dr. Roth—who was the junior physician—would have violated the employment contract.

9. Furthermore, the court is not convinced that the agreement was in effect when Dr. Roth resigned. Mutual assent to abandon a contract may be inferred from the attendant circumstances and the acts and declarations of the parties, even where the contract prohibits non-written modification. *Kirk v. Brentwood Manor Homes Inc.,* 191 Pa. Super. 488, 492, 159 A.2d 48, 50-51 (1960); John E. Murray Jr., *Contracts,* §143 at 838 (3d Ed. 1990). The focus of the abandonment inquiry is the intent of the parties, which is generally a question for the factfinder. *Kirk,* 191 Pa. Super. at 493, 159 A.2d at 51. The record indicates that PENT and Dr. Roth may have abandoned the agreement. Even though Dr. Roth's employer remained the same legal entity throughout the period of his employment, the substance of that entity changed. Two of the three shareholders left. The patient population served by the remaining shareholder, Dr. Rowe, grew significantly.

## CONCLUSIONS OF LAW

(1) PENT has failed to establish that it will suffer imminent, irreparable harm not compensable by monetary damages if Dr. Roth retains his staff privileges at Northeastern and continues to practice there.

(2) PENT has failed to show that greater injury will occur from denying the injunction than from granting it.

(3) PENT has failed to show that the requested injunction is reasonably calculated to abate the alleged harm to PENT.

(4) PENT has failed to show that its right to relief is clear.

(5) The lack of each of these elements requires that the court deny PENT's petition for a preliminary injunction.

Based on the foregoing, this court will enter a contemporaneous order denying the petition for preliminary injunction.

## ORDER

And now, March 13, 2000, upon consideration of the petition for a preliminary injunction and the response to it, the complaint in equity and the answer, all other matters of record and after a hearing and based upon the findings of fact and conclusions of law being filed contemporaneously with this order, it is ordered that the petition for a preliminary injunction is denied.

---

(2/1/00, N.T. 77-78, 169.) As Dr. Roth's practice evolved, so did Dr. Roth's compensation plan. Dr. Roth came to be paid in a manner which was not in accordance with the agreement. Statements to another physician suggest that Dr. Rowe believed the agreement was then problematical. Dr. McDonald testified that Dr. Rowe told him that PENT was in a state of flux, and that, because of the changes that PENT was undergoing, the arrangement with Dr. Roth was not defined. (2/1/00, N.T. 181-84.) In an effort to resolve these problems and clarify his relationship with PENT, Dr. Roth presented Dr. Rowe with a proposed new employment agreement over a year prior to the termination. (Exhibit D-5; 2/1/00, N.T. 89-91; 2/3/00, N.T. 89.) The acts and statements of the parties suggest to this court that the effectiveness of the original agreement is susceptible to question.