652 A.2d 948

FOREST CITY GRANT LIBERTY ASSOCIATES and
JLM Grant Liberty Associates, T/A Grant–
Liberty Development Group Associates,

v.

GENRO II, INC., T/A General Roofing Company and Carlisle
Tire & Rubber Company, a Corporation, and Carlisle Corpora-
tion, T/A Carlisle Syntec Systems and Insurance Company of
North America,

v.

MELLON–STUART COMPANY and Jos. L. Muscarelle, Inc.,
Individually and D/B/A Mellon–Stuart Company and Jos. L.
Muscarelle, Inc., a Joint Venture, Burt Hill Kosar Rittelman
Associates and UDA Architects, Individually D/B/A Joint Ven-
ture Architects, Baron/Wheeler, Inc., and RMAX, Inc.

v.

ALLIANCE INSURANCE GROUP, Alliance General Insurance
Company and Alliance Syndicate, Inc., Appellants.

FOREST CITY GRANT LIBERTY ASSOCIATES and
JLM Grant Liberty Associates, T/A Grant–
Liberty Development Group Associates,

v.

GENRO II, INC., T/A General Roofing Company and Carlisle
Tire & Rubber Company, A Corporation, and Carlisle Corpora-
tion, T/A Carlisle Syntec Systems and Insurance Company of
North America

v.

MELLON–STUART COMPANY and Jos. L. Muscarelle, Inc.,
Individually and D/B/A Mellon–Stuart Company and Jos. L.
Muscarelle, Inc., A Joint Venture, Burt Hill Kosar Rittelman
Associates and UDA Architects, Individually D/B/A Joint Ven-
ture Architects, Baron/Wheeler, Inc., and RMAX, Inc.

v.

ALLIANCE INSURANCE GROUP, Alliance General
Insurance Company and Alliance Syndicate, Inc.

**Appeal of RMAX, INC.**

Superior Court of Pennsylvania.

Argued Sept. 28, 1994.

Filed Jan. 12, 1995.

Bradley S. Tupi, Pittsburgh, for Alliance Ins. Group, Alliance General Ins. Co. & Alliance Syndicate, Inc.

Robert J. Cindrich, Pittsburgh, for RMax, Inc.

Before WIEAND, OLSZEWSKI and KELLY, JJ.

WIEAND, Judge:

In this dispute over an insurer's duty to indemnify, the principal issue makes it necessary that we construe a clause in the policy which requires the insured to "cooperate" with the insurer.

When the owners of the Liberty Center discovered defects in the roofing on their several buildings,[1] they commenced an action against Carlisle SynTec Systems, which had designed the several roofs, and General Roofing Company, which had installed the same. Joined as an additional defendant was RMax, Inc., which had supplied foam insulation for the project. It was alleged that the facer sheet on each side of the foam insulation had separated from insulation, a process known as delamination. Alliance Insurance Group was the liability carrier for RMax. At trial, RMax was represented by Terry Cavanaugh, Esquire.

During trial, extended negotiations resulted in a settlement, on February 20, 1991. Based on a report by Robert McNeil, an employee of Carlisle SynTec Systems, it was agreed that at least 27,000 square feet of roofing insulation had delaminated, resulting in damaged roofing. This area, it was agreed, should be repaired for $155,000. Because delamination, once begun, tends to migrate, it was also agreed that if repairs to the roof were found to be necessary in adjacent areas, they would be made at a cost of $7 per square foot. Finally, it was

---

1. The Liberty Center complex consists of three structures: a hotel, an office tower and a podium.

agreed that additional areas, not adjacent to identified areas but which were later discovered to be defective, would only be repaired if RMax agreed that delamination had occurred because of a defect in its product. Before these additional, non-adjacent areas could be repaired, however, the parties were to submit an amendment of the settlement agreement to Alliance. Universal Roofing Company was selected to perform the repairs. Both Alliance and RMax consented to the terms of the settlement.

After the settlement agreement had been approved, McNeil revisited the Liberty Center Complex in May, 1991, and determined that at least 14,085 additional square feet of insulation had delaminated and needed to be repaired. McNeil attributed this increased square footage to the migratory nature of delamination. As a result, McNeil amended his initial report and drawings. A copy of the amended report was submitted to RMax and Alliance.

Prior to the commencement of repairs, Cavanaugh contacted Alliance and suggested that Alliance hire an expert to monitor the work so as to prevent any overreaching on the part of Universal. Alliance rejected this suggestion and said that it would rely upon RMax to inspect the project from time to time. Although RMax agreed to visit the work site on occasion, it did not agree to monitor or supervise the project.

In August, 1991, Universal began work on the hotel roof. It repaired the hotel roof and the roof of the podium in areas which had been identified by McNeil and also in areas adjacent thereto. It also replaced the roof in some areas which had not been damaged by delamination. By the time it completed its work, almost the entire hotel and podium roofs had been replaced, and the cost had exceeded greatly the estimates contained in the McNeil report, which had formed the basis for the agreed settlement.

During the repair process Universal sent periodic invoices to Alliance. Although these invoices did not distinguish between areas identified by the McNeil reports and other areas in which repair work had been done, Alliance paid each invoice

without question or objection. In November, 1991, after paying $232,100.93, Alliance became aware that it had paid for roof repairs in areas not contemplated by the McNeil reports.

In December, 1991, McNeil visited the Liberty Center complex for a third time and discovered delamination of an additional 27,964 square feet on the office tower roofs. It was estimated that this additional damage would cost $195,748 to repair. On February 4, 1992, Alliance informed RMax that it would not indemnify it for this work.

RMax agreed with McNeil that the newest delamination had been caused by migration of the original damage and stipulated that it should be repaired pursuant to the settlement agreement. Therefore, after Alliance had refused further indemnification, RMax paid $160,062 to Universal for additional repairs. While performing the repair work, Universal replaced 4,350 square feet of undamaged roof at a cost of $37,750. Because RMax had not assigned a representative to supervise the project, it was unaware of Universal's continued overreaching.

In a proceeding for declaratory judgment, RMax contended that Alliance was liable for all costs of making roof repairs, as well as counsel fees. Alliance contended, inter alia, that it was excused from liability because of RMax's failure to cooperate by having its personnel oversee the repair work done by Universal. The trial court held that Alliance was liable for all repairs made pursuant to the settlement agreement and for counsel fees in the amount of $38,908. It was not liable, however, for unnecessary repairs of $37,750 made to the roofs of the office tower, which RMax had already paid and to which it had improperly consented. Both parties appealed.

█ Generally, where the terms of an insurance contract are ambiguous, they should be construed liberally in favor of the insured and strictly against the insurer. *Miller v. Prudential Ins. Co. of Amer.*, 239 Pa.Super. 467, 472, 362 A.2d 1017, 1020 (1976). Where the policy language is unambiguous, however, words are given their plain and ordinary meaning.

*Techalloy Co., Inc. v. Reliance Ins. Co.,* 338 Pa.Super. 1, 7, 487 A.2d 820, 823 (1984).

▐ RMax's duty to cooperate, as set forth in its policy with Alliance, was as follows:

(4) Insured's Duties in the Event of Occurrence, Claim or Suit:

. . . .

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.

The purpose of a cooperation clause in an insurance contract is to protect the insurer's interest and to prevent collusion between the insured and the injured party. 8 *Appleman, Insurance Law and Practice* § 4741. Although a breach of a duty to cooperate will relieve the insurer from liability under the policy, a failure to cooperate must be substantial and will only serve as a defense where the insurer has suffered prejudice because of the breach. *Id.* at § 4773. Whether there has been a material breach of an insured's duty to cooperate is a question for the finder of fact. *Cameron v. Berger,* 336 Pa. 229, 235, 7 A.2d 293, 296 (1938).

▐ By virtue of a cooperation clause, an insured binds itself to assist the insurer fully in its handling of the claim and agrees to take no action which would vitiate a valid defense. See: *United Services Automobile Ass'n v. Morris,* 154 Ariz. 113, 117, 741 P.2d 246, 250 (1987). An insured's duty to cooperate is breached where the insured neglects to disclose

information needed by the insurer to prepare a defense, does not aid in securing witnesses, refuses to attend hearings or to appear and testify at trial or otherwise fails to "render all reasonable assistance necessary to the defense of the suit." 8 *Appleman, Insurance Law and Practice* § 4774. See also: *H.Y. Akers & Sons, Inc. v. St. Louis Fire & Marine Ins. Co.,* 120 Ga.App. 800, 803–804, 172 S.E.2d 355, 359 (1969).

Despite the broad nature of the duty to cooperate, neither the parties nor our own research has disclosed a case in which a cooperation clause has been construed to include a duty on the part of the insured to supervise the implementation of an agreement of settlement accepted by the insurer. Such a duty is not within the general purpose of the cooperation clause and is not suggested by the express language thereof.

The trial court also found that RMax had not agreed separately with Alliance to monitor or supervise the repair work being done by Universal. Moreover, even if there had been a discussion regarding the approval of additional work, the evidence was that Alliance's practice had been to pay Universal's invoices without inquiry and without requiring prior approval by RMax. Additional areas of delamination, which were adjacent to known areas of damage, were discovered by Universal on a daily basis. The potential for this was known to both Alliance and RMax, as was the potential for overreaching by the contractor. The only way to guarantee that Universal correctly distinguished between damaged and undamaged insulation would have been to assign a qualified expert to monitor the repairs daily. Indeed, Cavanaugh had recommended such a course to Alliance. It was Alliance's responsibility to pay for the work; and, therefore, it had responsibility for establishing an effective program for monitoring the work. Having failed to do so, it cannot assert the insured's failure to cooperate as a defense to the obligation assumed pursuant to its settlement agreement.

It is appropriate for a trial court to reduce the recovery of an injured party by the amount of losses which

could have been avoided by the reasonable efforts of the injured party. *State Public Sch. Bldg. Authority v. W.M. Anderson Co.*, 49 Pa.Commw. 420, 423, 410 A.2d 1329, 1331 (1980). Cf.: *Dox Planks v. Ohio Farmers Ins. Co.*, 423 Pa.Super. 311, 318, 621 A.2d 132, 135 (1993), *allocatur denied,* 536 Pa. 624, 637 A.2d 284 (1993). This duty to mitigate damages prevents the breaching party from being penalized beyond the extent of the damages actually suffered and prevents the injured party from being rewarded for its failure to act. *Bafile v. Borough of Muncy*, 527 Pa. 25, 31, 588 A.2d 462, 464 (1991). In the fall of 1992, after Alliance had refused to indemnify its insured further, Universal repaired the office tower roof, for which RMax paid the sum of $160,062. Of this total amount, the trial court found, $37,750 was for unnecessary repairs. RMax had paid for these repairs without any attempt to ascertain whether they were within the parameters of the settlement agreement. Therefore, the court refused to require Alliance to pay for these unnecessary repairs. We find no error in the trial court's handling of this aspect of the case.

Finally, the trial court did not err by applying the combined self-insured retentions from the 1986 and 1987 policies of $75,000. Sufficient competent evidence supports this conclusion. See: *Ecksel v. Orleans Constr. Co.*, 360 Pa.Super. 119, 133, 519 A.2d 1021, 1028 (1987) (trial court's findings of fact will be sustained where they are supported by competent evidence). However, it does appear that the trial court made a minor mathematical error. The court mistakenly found that RMax had paid $70,033 in attorney's fees towards its self-insured retention; therefore, the court subtracted $4,967 from RMax's recovery. However, the stipulation of facts submitted by the parties clearly establishes that RMax paid $70,332.76 toward the self-insured retention and that the court should have subtracted $4,667.24 from RMax's recovery. This increases the amount of counsel fees recoverable by RMax to $39,208, and we will cause the order of the trial court to be amended accordingly.

As so amended, the order of the trial court is affirmed.