SCW WEST LLC, d/b/a Gold Coast Inn, Plaintiff,

v.

**WESTPORT INSURANCE CORPORATION,**
**Defendant.**

No. 10–cv–6050 (ADS)(AKT).

United States District Court, E.D. New York.

April 17, 2012.

Wilkofsky Friedman, Karel & Cummins, By Mark L. Friedman, Esq., of Counsel, New York, NY, for the Plaintiff.

Foran Glennon Palandech Ponzi & Rudloff, P.C., By Charles J. Rocco, Esq., Paul Christopher Ferland, Esq., Of Counsel, New York, NY, for the Defendant.

ARTHUR D. SPATT, District Judge.

The present declaratory judgment action concerns a dispute over whether an insured hotel has failed to cooperate with its insurer by refusing to authorize the appeal of a decision by the local building inspector to the state authority regarding certain repair work needed for property damage caused by a severe wind and rain storm. Both parties have moved for summary judgment. For the reasons that follow, the cross-motions are denied.

## I. BACKGROUND

The Plaintiff SCW West LLC, d/b/a Gold Coast Inn ("the Plaintiff" or "SCW") is the owner of the Gold Coast Inn, a hotel located at 1053 Northern Boulevard, Manhasset, New York (the "Hotel"). The Defendant Westport Insurance Corporation ("the Defendant" or "Westport") is an insurance company that provided coverage to the Plaintiff pursuant to Policy Number WPF110009051801, effective April 16, 2009 to April 16, 2010 ("the Policy"). The present dispute centers on one particular provision of the Policy ("Cooperation Clause"), which states:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM ...**

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions ....

**3. Duties in the Event of Loss or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property: ...

(8) Cooperate with us in the investigation or settlement of the claim.

On August 19, 2009, a severe wind and rain storm caused property damage to the Hotel, and consequently resulted in a loss to the Plaintiff's business ("The Loss"). The Policy requires Westport to determine the cost of repairing the damaged property:

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage ...

Westport retained an independent adjuster, Edward Kirby of Daynard & Van Thunen, to investigate and adjust the Loss. However, fixing the damaged property required the approval of the Village of Flower Hill ("the Village") Building Department Inspector ("Inspector"). Thus, Kirby retained an architect named Thomas F. Ercolano "to identify potential upgrades and communicate with the local building department authorities." (Stipulated Facts, ¶ 6.) Ercolano was to complete and submit drawings to the Village's building

authority that would properly effectuate repairs to the Hotel in accordance with the State code requirements and pursuant to the Policy. (Ferland Aff., Ex. 6.) Whether the repairs also involved certain upgrades to the Hotel in compliance with the State building code is the subject of the present dispute.

In January 2010, Ercolano prepared and submitted architectural drawings to the Inspector for approval, which detailed a method of "repair" to the Hotel. By characterizing the proposal as merely a "repair" to the Hotel under the Existing Building Code of New York State ("EBCNYS"), instead of an "alteration", the plans would not need to include certain upkeeps in accordance with the State's building code upgrades and hence would minimize Westport's Policy coverage. In other words, the distinction between a "repair" under Chapter 4 of the EBCNYS and an "alteration" under Chapter 5 is that "alterations" involve more extensive work because they involve complying with the current building code. *Compare* EBCNYS § 406.1 ("Repairs shall be done in a manner that maintains the level of accessibility provided") *with* EBCNYS § 506.1 ("A building, facility, or element that is altered shall comply with the applicable provisions in Sections 506.1.1 through 506.1.12, Chapter 11 of the Building Code of New York State, and ICC A117.1 unless technically infeasible").

In the present case, a "repair" would mean simply fixing the water damage that resulted from the storm. On the other hand, an "alteration" would require improvements to the Hotel, such as new energy-rated windows and new electric wiring. Westport claims that it is unable to determine the cost of the repairs until there is an approved set of drawings by the State that details the scope of the work. Thus, according to Westport, it cannot fully settle the Plaintiff's insurance claim until the State conclusively determines whether the work on the Hotel constitutes an alteration or a mere repair.

There is no question that under the Policy, Westport must pay the replacement costs for damage to SCW's buildings as well as any potential upgrades required by the State building code, if the work is classified as an alteration. (Friedman Aff., Ex. 1.) The Policy's Ordinance and Law provision provides:

> With respect to the building that has sustained covered direct physical damage, we will pay ... for loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building.

On February 3, 2010, in a memorandum titled "Plan Examination Comments" sent to Ercolano in response to his submission, the Village Building Inspector James M. Gilhooly wrote that compliance with certain state building code provisions was not indicated on the submitted drawings which could potentially affect the alteration level, and thus he requested that Ercolano "revise drawings accordingly, clarify and resubmit for further review." (Ercolano Aff., Ex. A.)

According to Westport, it sought further clarification regarding Gilhooly's response. On February 10, 2010, Ercolano contacted the New York State, Division of Code Enforcement and Administration ("the State") and spoke with an individual named Ed Girzone. Ercolano then followed up with Girzone via fax, to which he included Gilhooly's above response, a floor plan, and a written statement from Ercolano. Ercolano explained in this statement to Girzone that he had prepared drawings to repair two floors of one wing of the Hotel because of extensive water damage

due to roof leaks, and Ercolano further stated that he believed that Gilhooly's opinion was incorrect. (Ercolano Aff., Ex. B.) Thus, Ercolano asked Girzone for his interpretation of the submitted architectural drawings. There is no evidence in connection with Ercolano's initial oral communication with Girzone or Girzone's response to Ercolano's written communication.

In a letter dated February 11, 2010, Ercolano wrote to Gilhooly to convey his conversation with Girzone, and stated in this letter that "Mr. Girzone's response was that the work proposed was classified as a REPAIR and that ALTERATION–LEVEL 1 does not apply." (Ercolano Aff., Ex. C.) In response, Gilhooly wrote to Ercolano on March 2, 2010, explaining that Ercolano had not proposed an accurate representation of the construction in his February 11, 2010 letter. (Friedman Aff. 2, Ex. 1.) Gilhooly further explained that the permit application proposed to replace removed drywall, and that "[r]emoval and replacement of existing materials that serve the same purpose is the description of a level 1 alteration." (*Id.*) At the end, Gilhooly stated that Ercolano could request Girzone to submit a written interpretation to his office and that if Girzone wanted to discuss the facts of the case or review any of the record photos, to have Girzone contact him. (*Id.*)

On March 8, 2010, Ercolano wrote another letter to Gilhooly in which he stated that Cheryl Fischer, Assistant Director for Code Interpretation, agreed with Girzone's interpretation that the proposed work should be classified as a repair, and that Fischer "suggested that I provide you with a copy of [the New York State Department of State] *technical bulletin*" that would clarify that the repair work did not trigger the requirements for alteration levels 1, 2, or 3. (Ercolano Aff., Ex. D.)

On March 31, 2010, Fischer contacted Gilhooly directly regarding the Hotel as follows:

> This is in response to a question regarding whether a permit can be issued after the fact for a building which received water damage to the sheetrock and was repaired without a permit. YES. The responsibility for compliance with applicable codes is that of the building owner. Universally, regardless of the local regulations for administration and enforcement, it is the owners [sic] responsibility to ensure the construction is in compliance with the applicable codes in effect at the time of construction....

(Ercolano Aff., Ex. E.) Notably, this communication from Fischer does not indicate whether the proposed work should be classified as a repair or a level 1 alteration.

On May 19, 2010, the Village officially rejected Ercolano's proposed repairs via a letter from Gilhooly, which stated "it is the possession [sic] of this office that the proposed renovation constitutes a level 1 alteration", and that "[r]esubmission of drawings will be required in order to comply with this determination." (Ercolano Aff., Ex. F.) However, Ercolano did not resubmit the drawings.

On May 24, 2010, Ercolano contacted Girzone via letter, stating "[p]er your request I enclose copy of all correspondence pertaining to the issue of obtaining a building permit to repair the building because of extensive water." (Ercolano Aff., Ex. G.) He included the above-mentioned correspondence. On that same date, Ercolano also contacted Courtney Nation of the State's Division of Code Enforcement and Administration, stating "[p]er your request I enclose one copy of application for the appeal of the building inspector's decision to classify the repair work which was required because of extensive water damage caused by sudden rain during a reroofing

job as Alteration Level 1." (Ercolano Aff., Ex's. H & I.) In addition, on June 7, 2010, Ercolano contacted Nation via email to complain that Gilhooly was "not applying Technical Bulletin ... when making his code interpretation." (Ercolano Aff., Ex. J.) With regard to this technical bulletin relied upon by Ercolano and the Defendant, there is a factual dispute as to: (1) whether this bulletin is accurate; and (2) the force of this bulletin even if it is accurate, as neither version appears in the NYS Department of State, Division of Code Enforcement and Administration archives. (Miller Aff., ¶ 5.)

On June 8, 2010, Nation responded via email, stating that her understanding of the project was that the repairs to the building expanded beyond the area that was damaged, and that "[i]f the issue becomes contentious the only means of resolving it may be by appeal before our Board of Review." (Id.) The communication from Nation to Ercolano does not indicate whether she believed the proposed work would merely constitute a repair. In fact, Robert Miller, retained by the Hotel as an architect consultant on November 19, 2009, has sworn in an affidavit that he spoke with Nation "who agreed with my interpretation of the Code" that the work constituted an alteration. (Miller Aff., ¶ 3.)

In a letter dated June 23, 2010, Ercolano again contacted Nation to submit an application to appeal the Inspector's decision. Therefore, instead of resubmitting the drawings per Gilhooly's instructions, Westport sought to appeal this decision to the State.

However, on June 15, 2010, the State received a letter from the Plaintiff's attorney that protested Ercolano's ability to appeal the Inspector's decision to the State. (Ferland Aff., Ex. 5) Pursuant to the New York Codes, Rules, and Regulations, appeals may only be brought before the Board of Review by a "person aggrieved." 19 N.Y.C.R.R. § 1205.5(a). In particular, the Plaintiff's counsel Mark L. Friedman, Esq., wrote that "[i]t is the [SCW]'s position that neither the insurance company nor any of its agents or architects, including Mr. Ercolano, have standing to file an appeal, for they are not an aggrieved party. This is particularly so when the owners of this premises completely agree with the assessment of Mr. Gilhooly." (Id.)

Therefore, in a letter dated June 23, 2010, Nation told Ercolano that if he wished to pursue the appeal, he would "need to provide evidence that [he] qualif[ed] as, or represent, an aggrieved party in this matter." (Ercolano Aff., Ex. J.) Accordingly, such an appeal could not be initiated unless the Plaintiff filed the appeal itself or authorized Ercolano to act on its behalf for that purpose.

Westport alleges that it engaged in a five month long campaign to obtain the Plaintiff's cooperation in filing the appeal. In particular, the Defendant maintains that it wrote to the Plaintiff on four separate occasions to request its cooperation with filing the appeal, while advising the Plaintiff that it was obstructing its ability to determine the value of the Loss and informing the Plaintiff that its refusal to cooperate would ultimately be considered a breach of the Policy's Cooperation Clause. However, the Plaintiff agreed with the Village's decision and refused to either file the appeal or authorize Ercolano to file the appeal on its behalf.

According to the Plaintiff, Westport knew all along that the damage involved would lead to an "alteration" rather than a "repair", in light of the Fire Marshall's inspection in December 2009. (See Friedman Aff., Ex. 4c ("The Fire Marshal [sic] will not allow any part of the building to be

occupied until the building has been repaired and brought up to present code including a sprinkler and standpipe system and a fire detection and alarm system.").) Moreover, the Plaintiff's public adjuster claims that at a meeting on December 16, 2009 with Miller, the Plaintiff's architect, Kirby, and Ercolano, Miller informed everyone that the damages caused by the windstorm loss would most definitely require an "alteration" and not a "repair", and thus the Defendant was aware of that fact before Ercolano submitted a plan reflective only of a "repair." (Aff. Allan Sabel, ¶ 6.) The Plaintiff has also submitted an affidavit from Miller, in which he states that "[a]fter reviewing the interior and exterior of the structure on November 19, 2009, I immediately realized that the damage suffered would require more than a mere "repair" under the 2007 Existing Building Code of New York State ... but would constitute an "alteration" thereunder." (Miller Aff., ¶ 2.)

However, according to the Defendant, SCW had its own selfish motivations for wanting Ercolano's proposal to be an alteration, because this categorization by the Inspector would result in substantial improvements to the Hotel at Westport's expense. Westport alleges that the Plaintiff's refusal to participate in an appeal of the Inspector's determination to the State Board of Review constitutes a breach of the Policy's Cooperation Clause. The practical effect of this dispute is that until the plans are approved, Westport is unable to accurately determine the cost of rebuilding the property and thus has not fully paid out the proceeds under the Policy.

On November 22, 2010, the Plaintiff filed a declaratory judgment action against Westport in New York State Supreme Court, Nassau County. In particular, SCW seeks a declaration that its actions in not appointing Defendant Westport's architect as its agent to pursue an appeal does not constitute a breach of the Cooperation Clause of the Policy. On December 30, 2010, the Defendant Westport removed the case to this Court. On September 9, 2011, both parties filed cross-motions for summary judgment.

## II. DISCUSSION

### A. *Legal Standard on a Motion for Summary Judgment*

It is well-settled that summary judgment under Fed.R.Civ.P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" within the meaning of Fed.R.Civ.P. 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989)). On cross-motions for summary judgment, the court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-

moving party. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993).

Once the moving party has met its burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

### B. Legal Standard for Lack of Cooperation

▆▆▆ Both parties agree that New York law governs this dispute. Under New York law, it is clear that "when an insured deliberately fails to cooperate with its insurer in the investigation of a covered incident as required by the policy, the insurer may disclaim coverage in the absence of a waiver by or estoppel of the insurer." 70A N.Y. Jur. 2D Insurance § 2122. "The burden of proving lack of co-operation of the insured is placed upon the insurer." *Thrasher v. United States Liab. Ins. Co.*, 19 N.Y.2d 159, 278 N.Y.S.2d 793, 225 N.E.2d 503 (1967) (*citing* Insurance Law, § 167, subd. 5). The relevant standard of proof is a preponderance of the evidence. *See Ashline v. Genesee Patrons Co-op Ins. Co.*, 224 A.D.2d 847, 638 N.Y.S.2d 217 (3d Dep't 1996); *Avarello v. State Farm Fire and Cas. Co.*, 208 A.D.2d 483, 616 N.Y.S.2d 796 (2d Dep't 1994).

To effectively deny insurance coverage based upon lack of cooperation, an insurance carrier must demonstrate (1) that it acted diligently in seeking to bring about the insured's cooperation, (2) that the efforts employed by the carrier were reasonably calculated to obtain the insured's cooperation, and (3) that the attitude of the insured, after his cooperation was sought, was one of willful and avowed obstruction.

*BaghalooWhite v. Allstate Ins. Co.*, 270 A.D.2d 296, 704 N.Y.S.2d 131 (2d Dep't 2000) (citing *Physicians' Reciprocal Insurers v. Keller*, 243 A.D.2d 547, 665 N.Y.S.2d 515 (2d Dep't 1997)); *see also Thrasher v. United States Liab. Ins. Co.*, 19 N.Y.2d 159, 278 N.Y.S.2d 793, 225 N.E.2d 503 (1967); *State Farm Indem. Co. v. Moore*, 58 A.D.3d 429, 872 N.Y.S.2d 82 (1st Dep't 2009); *Country–Wide Ins. Co. v. Henderson*, 50 A.D.3d 789, 856 N.Y.S.2d 184 (2d Dep't 2008); *Blinco v. Preferred Mut. Ins. Co.*, 11 A.D.3d 924, 782 N.Y.S.2d 483 (4th Dep't 2004). While an insurer who alleges a violation of a cooperation clause need not show that that the insured openly avowed his intent to obstruct the insurer, it is a heavy burden to show circumstances that support the inference that the insured's failure to cooperate was deliberate. *See State Farm Indem. Co. v. Moore*, 58 A.D.3d 429, 872 N.Y.S.2d 82 (1st Dep't 2009).

▆▆▆ Once a lack of cooperation is shown, the burden is then upon the insured to show an excuse for the conduct. *See Mionis v. Merchants Mut. Cas. Co.*, 9 Misc.2d 357, 172 N.Y.S.2d 727 (2d Dep't 1957); *Shalita v. Am. Motorists Ins. Co.*, 266 A.D. 131, 41 N.Y.S.2d 507 (3d Dep't 1943); *see also New York Cent. Mut. Fire Ins. Co. v. Rafailov*, 41 A.D.3d 603, 605, 840 N.Y.S.2d 358, 360–61 (2d Dep't 2007) ("An insured's duty to cooperate is satisfied by substantial compliance, and where a delay in compliance is neither lengthy nor willful, and is accompanied by a satis-

factory explanation, preclusion of a claim is inappropriate.").

 However, the issue presently before the Court is not whether the Defendant insurer has satisfied its burden of proof. Rather, the Court agrees that:

> [b]urden of proof refers to the standard for weighing evidence at trial to reach a conclusion on a factual issue. The concept is generally inapplicable to a motion for summary judgment, since the question is whether the evidence raises a factual issue, not how the standard of proof would apply to the resolution of that issue.
>
> When the term burden of proof is used in the context of a summary judgment motion, it generally refers to the issue of which party has the burden to show the presence or absence of a factual issue. *See generally* 10A Wright, Miller and Kane, Federal Practice and Procedure § 2727 (West 2008). In a case where there is a dispute over what an insured had done to cooperate, or where a jury, reviewing those facts, could reasonably conclude either way that the insured did or did not cooperate, then the burden to prove noncooperation by a preponderance of the evidence would apply at trial.

*Richie's Corner, Inc. v. Nat'l Specialty Ins. Co.,* 598 F.Supp.2d 274, 278 n. 5 (E.D.N.Y.2008)

 Summary judgment may be appropriate where an insured fails to cooperate with the insurer as a matter of law. "Violating an obligation to cooperate constitutes a material breach of the insurance contract and a defense to indemnification under the policy." *Koppelman v. Standard Fire Ins. Co.,* No. 05 Civ. 2496, 2008 WL 789882, at *3 (E.D.N.Y. March 21, 2008) (citing *Rosenthal v. Prudential Property & Casualty Co.,* 928 F.2d 493, 494 (2d Cir. 1991)). However, where there is an issue of fact as to whether a plaintiff has failed

to cooperate, summary judgment is properly denied. *See, e.g., Van Gordon v. Otsego,* 232 A.D.2d 405, 648 N.Y.S.2d 306 (2d Dep't 1996).

In the present case, there are three major disputes that the Court must address. First, there is the question of whether authorization to pursue an appeal of the local building inspector's decision to the state falls within the confines of the Policy's Cooperation Clause. This is a pure question of contract interpretation and the entire case hinges on this threshold determination. If Westport's demand does not fall into the Cooperation Clause as a matter of law, then the Plaintiff's motion for summary judgment will be granted and the Defendant's motion for summary judgment will be denied. However, if it does fall into the scope of the Cooperation Clause as a matter of law, then the Court must assess two further issues: (1) whether there is a question of fact as to whether the insured has cooperated (*See, e.g., Richie's,* 598 F.Supp.2d at 278 n. 5 ("however, neither party contends that there is a factual dispute as to what plaintiff did to cooperate and I hold that no reasonable jury could find that plaintiff substantially complied with the cooperation clause")); and (2) whether there is a question of fact as to whether the insured has provided a reasonable excuse for its failure to cooperate. The Court will address each of these issues in turn.

### C. As to Whether Westport's Demand Falls Within the Scope of the Cooperation Clause

 As stated above, the initial inquiry is whether the Plaintiff's actions in refusing to cooperate with Westport's request to appeal the local building inspector's denial of Westport's architect's application for a permit to perform repairs at the Plaintiff's hotel falls within the scope of

the Policy's Cooperation Clause. Thus, because the question before the Court is one of contract interpretation, the analysis begins with an examination of the language in the insurance policy.

■ "Insurance policies are contracts and are therefore interpreted according to the rules of contract interpretation." *Frazer Exton Dev., L.P. v. Kemper Env., Ltd.*, 153 Fed.Appx. 31, 32 (2d Cir. 2005); *see World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 183–84 (2d Cir.2003); *In re Covert*, 97 N.Y.2d 68, 76, 735 N.Y.S.2d 879, 761 N.E.2d 571, 576–77 (2001) ("Insurance policies are, in essence, creatures of contract, and accordingly, subject to principles of contract interpretation.") (citations and internal quotation marks omitted). Under New York law, which the parties agree is controlling here, "an insurance policy is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes." *In re Prudential Lines Inc.*, 158 F.3d 65, 77 (2d Cir.1998); *see Zahler v. Twin City Fire Ins. Co.*, No. 04 Civ. 10299, 2007 WL 2936321, at *2 (S.D.N.Y. Sept. 17, 2007) ("New York insurance law provides that 'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'" (*quoting Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000))).

■ Under New York law, the initial question for the court on a motion for summary judgment with respect to a contract claim is "whether the contract is unambiguous with respect to the question disputed by the parties." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir.2002). "The matter of whether the contract is ambiguous is a question of law for the court." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010); *see United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128, 130 (2d Cir.2006) ("Whether the language in an insurance contract is ambiguous is also a question of law").

■ An ambiguity exists where the terms of the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *International Multifoods*, 309 F.3d at 83 (internal quotation marks omitted); *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir.1998) ("As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading.").

■ On the other hand, no ambiguity exists where the contract language has "'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (*quoting Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation," *Hunt*, 889 F.2d at 1277, unless each is a "reasonable" interpretation. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). Where the parties dispute the meaning of particular contract clauses, the task of the court "is to determine whether such clauses are ambiguous when 'read in the con-

text of the entire agreement.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993).

■■■■ Ordinarily, if an "ambiguity arises that cannot be resolved by examining the parties' intentions, ... the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract." *Haber,* 137 F.3d at 697. Courts often apply the *contra proferentem* rule and interpret an ambiguity in the policy against the insurer, the party that imposed its inclusion in the contract. *See, e.g., Westchester Resco Co. v. New England Reins. Corp.,* 818 F.2d 2, 3 (2d Cir.1987) (per curiam). However, this rule of construction only applies if there is an ambiguity that may not be resolved by resort to extrinsic evidence of intent. *See Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins.,* 472 F.3d 33, 46 (2d Cir.2006) ("Thus, " '[i]f the extrinsic evidence does not yield a conclusive answer as to the parties' intent,' a court may apply other rules of contract construction, including the rule of *contra proferentem* " ").

In the instant case, the contract plainly states that in the event of a loss or damage to the covered property, the insured had a number of duties, including to give the insurer "prompt notice of the loss or damage" and "a description of how, when are where the loss or damage occurred", as well as to permit the insurer to inspect the property proving the loss or damage and to examine books and records. Relevant to this case, included as subsection (8) of this section, the insured also has the duty to "[c]ooperate with [the insurer] in the investigation or settlement of the claim." This duty is broadly phrased, and does not on its face explicitly include or exclude the duty at issue here.

No one disputes that it is necessary for Westport to determine the amount of its loss in order to settle the claim. Moreover, the parties do not appear to dispute that the initial application to the local building inspector for approval in the first instance constituted part of the settlement process, and that participating in that act fell within the scope of the Cooperation Clause. However, the parties do dispute whether determining the amount of the loss necessarily includes receiving approval or denial of the relevant repairs by the State. The Defendant claims that this is a vital step in the process, and only once a determination is made at the State level, can it accurately assess the loss. On the other hand, the Plaintiff contends that the Defendant already determined the amount of the loss when the adjustor made its initial estimation of the cost of the repairs, and that this appeal is more properly characterized as ´part of the insurer's process to reduce the amount it must pay out on the claim.

Generally speaking, the vast majority of cases to have addressed a cooperation clause in an insurance policy in any jurisdiction focus on typical failures to cooperate, such as the failure to provide prompt notice of the loss or the failure to supply certain documents. However, the Court is not convinced that a lack of precedent on this precise set of circumstances necessarily means that such a duty is automatically excepted from a broadly worded cooperation clause. Moreover, although a large number of disputes regarding cooperation clauses typically pertain to other duties that are explicitly described in the policy, there is no requirement that the agreement contain every single way in which cooperation may be needed, especially because "the failure to cooperate may take many forms." 49 Willston on Contracts, § 107 (2011); 14 Couch on Insurance, § 199:14 ("Cooperation clauses differ as to

the particular cooperation expected.... the specific language of provisions significantly differs from policy type to policy type."). The provision at issue here, on its face, is broad enough to reasonably encompass the conduct at issue here.

More importantly, the Court is not presented with any extrinsic evidence to support a particular interpretation, and thus cannot resolve this ambiguity as a matter of law by looking to the customs, practices, usages and terminology as generally understood in the particular business. *See Law Debenture,* 595 F.3d at 466 ("Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized."). Even if the Court were presented with extrinsic evidence, if such evidence presents issues of credibility or a choice among reasonable inferences, the intent of the parties is a for the trier of fact. *In re Prudential Lines Inc.,* 158 F.3d at 77.

Furthermore, the Defendant's interpretation of the cooperation clause is not an unreasonable one based on the Policy itself or the nature of the parties' relationship. The purpose of a cooperation clause in an insurance contract is to protect the insurer's interest and to prevent collusion between the insured and the injured party. 8 Appleman, Insurance Law and Practice, § 4741. Duties that typically fall within the scope of cooperation clauses, whether explicitly mentioned or not, are responsibilities that the insurer must rely upon the insured to accomplish because it is conduct that cannot practically be completed by the insurer. For example, the insurer must have cooperation of the insured to have prompt notice of a claim, because it would be impossible for the insurer to have knowledge of an incident without the insured telling it so. As another example, if the insurer needs to examine the damaged property, it cannot do so without the insured's permission. Thus, because under the New York Codes, Rules, and Regulations, appeals may only be brought before the Board of Review that are made by a "person aggrieved," 19 N.Y.C.R.R. § 1205.5(a), it similarly places responsibility for such an undertaking upon the insured, because it is conduct that cannot practically be done by the insurer. Hence, it is not unreasonable, as a matter of law, for the Cooperation Clause in the present Policy to encompass such a duty.

The case law, which is sparse on this precise issue, does not clarify the ambiguity in this cooperation provision. The Plaintiff cites to a line of cases which designate the duties of an insured to cooperate as limited. However, the reason why these duties were restricted by the courts in this state is because these cases occurred in the context of arson, where the duty to cooperate in New York is set out by statute. *See Richie's Corner, Inc. v. Nat'l Specialty Ins. Co.,* 598 F.Supp.2d 274, 276 n. 3 (E.D.N.Y.2008) ("the broad duty applicable in suspected arson cases must be distinguished from other property damage cases in which the insured's involvement is not suspected"); *Harary v. Allstate Ins. Co.,* 988 F.Supp. 93, 102 (E.D.N.Y.1997) ("In New York, the scope of the duty a cooperation clause establishes [in arson cases] is prescribed by statute."); *Kagan v. Taylor,* 558 F.Supp. 396, 399 (E.D.N.Y.1983) (noting that the court was "unable to say, as a matter of law, that plaintiffs are in breach of the general language contained in the cooperation clause drafted by defendant" because the insured's failure to submit to examination under oath or to produce relevant tax returns could fall within the broadly worded "cooperation clause" of the policy as it was not governed by New York's standard fire insurance policy).

Other cases cited by the Plaintiff similarly do not lead the Court to conclude, as a matter of law, whether authorization to appeal is included in the broadly worded Cooperation Clause of the Policy. In *Mesaba Holdings, Inc. v. Federal Insurance Company*, No. 02 Civ. 660, 2002 WL 31856384, at *4, *5 (D.Minn. Dec. 19, 2002), the Minnesota district court stated that the county had the right to interpret its own building code regulations and that Mesaba had no obligation to contest its decision, because "the Court conclude[d] that Wayne County, not Federal, is the arbiter of what its ordinances 'require' and Mesaba could rely on Wayne County's determination as to whether or not it was in compliance." However, the *Mesaba* case was not in connection with a cooperation clause in the insurance policy, but rather whether the insurance company was required to cover certain upgrades at all. In the present case, Westport does not dispute that if the work is determined by the State to be an alteration and not a repair, that certain upgrades would need to be made, and that it would theoretically be covered under the Policy. (*See* Def. Opp. at 16 ("In contrast to the insurer in *Mesaba*, Westport has never denied the need for code upgrades.").) Moreover, it is not clear from the decision whether a right to appeal the County's determination was available and whether a reasonable basis for such a contest existed.

The case of *Forest City Grant Liberty Associates v. Genro II, Inc.*, 652 A.2d 948, 438 Pa.Super. 553, 560 (1995) is similarly distinguishable. There, the court found that despite the broad nature of the duty to cooperate, it would not construe the cooperation clause to include a duty on the part of the insured to supervise the implementation of an agreement of settlement accepted by the insurer. However, the clause in that case was narrower than the Cooperation Clause in the instant case. In

addition, the duty at issue there—to have the insured's personnel oversee certain repair work made pursuant to a settlement agreement—was not an action which was not solely within the ability of the insured and necessary in order to process the claim. *See id.* ("The potential for this was known to both Alliance and RMax, as was the potential for overreaching by the contractor.").

The Plaintiff also cites to *Maryland Casualty Company v. Frank*, 452 P.2d 919, 85 Nev. 209 (1969) for support. However, the *Maryland* court actually faulted the insurance company for not contesting the condemnation order by the local authority before the proper board of appeals at the local government level, and thus found that the local authority's determination was sufficient to support a finding of total loss, contrary to the insurer's position. In fact, the *Maryland* court stated that "Appellant could have exercised its policy option to repair the property if it could secure approval from the city or could have contested the condemnation order. It did neither and the damaged structure was demolished." 452 P.2d at 920.

In sum, the Court finds the language of the Cooperation Clause to be ambiguous, in that it is not entirely clear from the Policy whether the Plaintiff's actions in refusing to cooperate with Westport's request to appeal the local building inspector's denial of Westport's architect's application for a permit to perform repairs at the Plaintiff's hotel could even potentially be a breach of the Policy's Cooperation Clause. Where, as here, the meaning of a particular contractual provision is ambiguous and the intent of the parties cannot be determined from the contractual language itself, the ambiguity presents a question of fact to be resolved by the trier of the facts. As the Court cannot say, as a matter of law, whether the Defendant's demand is

proper and viable under the terms of the Policy, the Defendant's motion for summary judgment necessarily fails.

### D. As to Whether There is a Reasonable Excuse for the Plaintiff's Lack of Cooperation

■ However, finding the Cooperation Clause to be ambiguous does not necessarily resolve the Plaintiff's motion for summary judgment. Even assuming that the Plaintiff did have a duty under the Cooperation Clause to participate and/or authorize the appeal of the Flower Hill Building Inspector's determination, and even assuming that the Plaintiff willfully and avowedly failed to cooperate, the Plaintiff may nevertheless be entitled to summary judgment if it can demonstrate that there is no question of fact as to whether the Plaintiff had a reasonable excuse for failing to cooperate. *See Abercrombie & Fitch Co. v. Federal Ins. Co.*, 589 F.Supp.2d 937 (S.D.Ohio 2008) (finding that although the question of whether an insured breached the cooperation clause is generally determined in view of the facts and circumstances in each case, the issue may be determined by the court as a matter of law when a case presents undisputed facts). *But see Allstate Ins. Co. v. Loester*, 177 Misc.2d 372, 375, 675 N.Y.S.2d 832 (Sup.Ct.1998) ("it has been recognized that the issue whether the insured failed to cooperate with the insurer in the defense of the action poses a factual question for the jury.... The critical determination is a factual one and requires a balancing of the corresponding duties, that by the insured to cooperate, and the insurer's duty to exercise diligence and good faith in bringing that cooperation about."). In other words, cooperation by the insured may be excused as a matter of law if it is improperly demanded; for instance, if it includes assistance in a sham defense (or

appeal) by the insurer. 14 Couch on Insurance, § 199:19.

As set forth above, to effectively deny insurance coverage based upon a lack of cooperation, an insurance carrier must demonstrate (1) that it acted diligently in seeking to bring about the insured's cooperation, (2) that the efforts employed by the carrier were reasonably calculated to obtain the insured's cooperation, and (3) that the attitude of the insured, after his cooperation was sought, was one of willful and avowed obstruction. As opposed to most cases that relate to insurance policies' cooperation clauses, the present case does not largely concern whether the insurance carrier acted diligently in seeking to bring about the insured's cooperation or whether the efforts employed by the carrier were reasonably calculated to obtain the insured's cooperation. There is no question that Westport acted diligently in seeking to have SCW cooperate in pursuing the appeal of the Flower Hill decision, and there is also no question that SCW failed to cooperate and that this failure was deliberate. Although the Plaintiff argues that it did not willfully obstruct the Defendant's settlement of the claim, it did willfully obstruct the Defendant's appeal, which the Court finds to be part of the settlement process.

■ The parties' dispute mainly centers on the insured's excuses for its failure to cooperate. Even if Westport could meet the heavy burden to show that SCW's attitude was one of willful and avowed obstruction, it must necessarily involve "a pattern of noncooperation *for which no reasonable excuse [is] offered.*" *Cooper v. New York Cent. Mut. Fire Ins. Co.*, 72 A.D.3d 1556, 1557, 900 N.Y.S.2d 545, 547 (4th Dep't 2010) (emphasis added); *see Levy v. Chubb Ins.*, 240 A.D.2d 336, 337, 659 N.Y.S.2d 266 (1st Dep't 1997) ("Willful noncooperation has been found to

exist when there is a pattern of noncompliance for which no reasonable excuse can be offered, or where the failure to cooperate is persistent"). "[W]hen evaluating an insurer's rights to investigation [sic] of a claim, the insurer's rights tend to be measured by 'reasonableness,' with the courts attempting to balance the insurer's legitimate interest in ascertaining the validity and extent of the claim against the insured's ... rights to both privacy and prompt payment of sums due under the terms of the contract." *Fla. Gaming Corp. v. Affiliated FM Ins. Co.,* 502 F.Supp.2d 1257, 1261 (S.D.Fla.2007) (internal citations omitted).

Other courts have held that "where the 'insured cooperates to some degree or provides an explanation as to its noncompliance, a fact question is presented' regarding the necessity or sufficiency of compliance." *Sunshine State Ins. Co. v. Corridori,* 28 So.3d 129, 131 (Fla.Dist.Ct. App.2010) (*quoting Haiman v. Fed. Ins. Co.,* 798 So.2d 811, 812 (Fla.Dist.Ct.App. 2001)). *Accord El–Ad Enclave at Miramar Condominium Ass'n, Inc. v. Mt. Hawley Ins. Co.,* 752 F.Supp.2d 1282, 1286–87 (S.D.Fla., 2010). In the present case, although the Plaintiff essentially acknowledges that it willfully and openly obstructed the Defendant's appeal of the Flower Hill decision, it "has offered reasons for doing so, and the issue concerning the validity of those reasons cannot be determined as a matter of law on the record before [the Court]." *Cooper,* 72 A.D.3d at 1557, 900 N.Y.S.2d 545.

First, the Plaintiff cites to the delay that would ensue if the Defendant were to pursue the appeal. According to the Plaintiff, it would take six to nine months to consummate. The Plaintiff contends that this alleged delay would cause a loss to the Hotel's business. As an initial matter, this position is curious in light of the fact that the Plaintiff chose to file a lawsuit to prevent the appeal, and this lawsuit has now been pending for more than a year. In any event, the Defendant claims that "this assertion is unsupported and quite simply untrue. There is nothing in the record to indicate that the appeal process would take six to nine months, beyond the hearsay set forth in the Complaint and Plaintiff's [motion for summary judgment] about alleged conversations with state officials." (Def. Opp. at 12.) Thus, there is a factual dispute as to whether such an extensive delay would even result from the appeal. For this reason, the Court cannot find, as a matter of law, that the alleged delay provides a reasonable excuse for SCW's failure to cooperate.

Second, the Plaintiff claims that it did not authorize Ercolano to prosecute the appeal because he is untrustworthy. For example, the Plaintiff alleges that Ercolano indicated back in November 2009 that the plans were approved by the "Manhasset Building Department", but the Plaintiff eventually realized that the "Manhasset Building Department" does not exist. (Friedman Aff., Ex. 4; *see also id.,* Ex. 4f (email from Sabel to Kirby dated February 17, 2010) ("This is the second time that Mr. Ercolano has not told you the truth ... The insured and myself have lost any confidence that Mr. Ercolano can be honest and do this job properly. Under the circumstances and untruths told by Mr. Ercolano I might suggest that you retain another expert.").) Again, the Plaintiff's allegations of Ercolano's dishonesty present factual issues, particularly credibility determinations, which are better left to the province of the trier of the facts. Thus, the Court cannot say as a matter of law that the Plaintiff's subjective skepticism of Defendant's agent provides a reasonable excuse for its failure to cooperate.

Third, SCW spends a substantial portion of its motion pointing to Westport's alleged bad faith, arguing that Westport's motivations in pursuing the appeal were not to investigate or settle the claim, but rather for its own financial gain. While it is ideal that the insured and the insurer's interests are always aligned, an insurance company is still a for-profit business enterprise with a bottom line. It is not beyond the realm of possibility that Westport is seeking to comply with its duties under the Policy while simultaneously seeking to limit its own financial exposure. However, this does not necessarily equate with bad faith that would provide a reasonable excuse for the Plaintiff's failure to cooperate. As long as the intended appeal had the ultimate purpose of settling the claim, pursuant to the provisions of the policy, Westport's additional motivations are irrelevant. Regardless, Westport's alleged unscrupulous motivations present an issue of fact that cannot be resolved on a motion for summary judgment.

Finally, the Plaintiff contends that an appeal of the Flower Hill decision would be futile and frivolous, in light of the evidence put forth by the Plaintiff that indicates that everyone involved with the renovations, including Ercolano at the outset, believed that the loss constituted an alteration rather than a repair under the State's building code. The Court agrees that if such an appeal would be frivolous, then as a matter of law, there would be a reasonable excuse for the Plaintiff's failure to cooperate because the appeal would be akin to a sham defense. *See Rivera v. Allstate Ins. Co.*, 100 Fed.Appx. 641, 644 (9th Cir.2004) (noting the possibility that a "reasonable excuse" may suffice to preclude summary judgment on the basis of the insured's failure to give a recorded statement); 49 Wilston on Contracts, § 107 ("Nor need the insured assist the insurer in making trivial, sham or other-

wise frivolous or vexatious claims or defenses, or merely technical defenses.").

However, the "reasonable excuse" offered by the Plaintiff is only reasonable if it is in fact true that such an appeal would have been frivolous. Although the Plaintiff has offered substantial evidence in this regard, the Defendant nevertheless maintains that Ercolano received an oral communication from the State indicating that the Inspector's opinion was erroneous and thus such an appeal would have merit. (*See* Def. Opp. at 5 ("Ercolano received confirmation from the State that the drawings constituted a simple repair, and that alterations were not required.").) A determination as to reasonableness likely hinges upon a credibility determination of Ercolano's testimony.

Therefore, on the basis of the evidence before it, the Court cannot say, as a matter of law, that the appeal in this case would be futile and thus akin to a "sham defense" or the execution of instruments one believes to be erroneous. *See Am. Sur. Co. of N.Y. v. Diamond*, 1 N.Y.2d 594, 599, 136 N.E.2d 876, 879–80 (1956). For this reason, the Court must deny the Plaintiff's motion for summary judgment so that a trier of fact can resolve the factual dispute of whether the Plaintiff's excuses for failing to cooperate with the Defendant's demand were reasonable in order to preclude the Defendant from asserting a violation of the Cooperation Clause and consequently denying coverage.

## III. CONCLUSION

In sum, while the Court agrees that "policyholders [should not] be at the mercy of the companies on some 'theirs not to reason why' theory," and that the insured should also not be " 'mere puppet(s) in the hands of the insurer' ", *Id.* (*quoting Royal*

*Indem. Co. v. Morris,* 37 F.2d 90, 92 (9th Cir.1929)), this case presents "another kind of fact situation, where reasonable men [or women] could disagree" so that the cross-motions for summary judgment must be denied. *Id. See Trident Intern. Ltd. v. Am. Steamship Owners Mut. Protection,* No. 05 Civ. 3947, 2008 WL 2909389, at *4 (S.D.N.Y. July 24, 2008) ("Based upon a review of the parties' arguments, their respective (and voluminous) 56.1 statements, and the competing affidavits issued in support of these cross-motions, it is apparent to the Court that summary judgment is wholly inappropriate in this case. Significant and genuine issues of material fact permeate every aspect of this dispute. Among other things, the parties disagree about the level of cooperation ..., and whether the parties' actions were, or were not, in compliance with their respective obligations under the insurance contract."). *See also Turkow v. Erie Ins. Co.,* 20 A.D.3d 649, 798 N.Y.S.2d 768 (3d Dep't 2005) (affirming order denying insurer's motion for summary judgment, because questions of fact existed regarding credibility issues surrounding alleged non-cooperation); *Baust v. Travelers Indem. Co.,* 13 A.D.3d 788, 790, 786 N.Y.S.2d 604, 606 (3d Dep't 2004) ("the record contains questions of fact concerning the reasonableness of plaintiff's cooperation in scheduling examinations and whether he in fact knowingly or willfully failed to attend any scheduled appointments ... thus precluding dismissal of the complaint on this ground."). *Cf. Am. Transit Ins. Co. v. Fuentes,* 1 Misc.3d 787, 771 N.Y.S.2d 295 (Sup.Ct., Kings Co., 2003) (granting judgment for the insurer because insured's failure to cooperate was without any apparent reasonable justification, especially because he chose not to submit opposition papers and left the Court to speculate as to the reasons for his conduct).

For the foregoing reasons, it is hereby:

**ORDERED,** that the Plaintiff's motion for summary judgment is denied; and it is further

**ORDERED,** that the Defendant's motion for summary judgment is denied; and it is further

**ORDERED,** that the parties are directed to appear before the Court on April 26, 2012 at 9:30 am for a pre-trial conference in Courtroom 1020. Counsel shall have the authority to discuss settlement at this conference.

**SO ORDERED.**